[Civ. No. 51523. First Dist., Div. Four. Aug. 19, 1981.]

ROCK LaROSA, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
JOE CLAR & SONS, Real Party in Interest.

742

COUNSEL

Scher & Bassett, Les Scher and Meyer Scher for Petitioner.

No appearance for Respondent.

Ropers, Majeski, Kohn, Bentley, Wagner & Kane, Michael J. Brady and Mark G. Bonino for Real Party in Interest.

OPINION

CALDECOTT, P. J.—The question presented by this petition for writ of mandate or prohibition is whether defendants, who are in the business of selling various kinds of used machinery, are strictly liable for a defect of undetermined origin in a machine which defendants sold but which they neither inspected, repaired nor modified.

Petitioner Rock LaRosa, plaintiff in the underlying action for damages for personal injury (claimant) was injured when a punch press, owned by his employer, malfunctioned. The employer had purchased the punch press, used, from real party in interest Joe Clar & Sons. Claimant sued Clar and Clar's employee Clyde Batavia (collectively Clar), among other defendants, upon theories of negligence and strict products liability. Clar moved for summary judgment which was denied as to the negligence theory but granted as to claimant's strict products liability theory. Claimant seeks a writ of prohibition or mandate to vacate the order granting partial summary judgment. Review by extraordinary writ is appropriate. (*Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553, 557-558 [145 Cal.Rptr. 657].) This court issued an alternative writ of mandate.

We conclude, (1) that California's evolving general rules of strict products liability do not apply to Clar in the circumstances of this action and, (2) that there is no sufficient policy predicate for imposing an analogous but distinct strict products liability rule upon a used-goods dealer in Clar's situation. Accordingly, this court approves the partial summary judgment for Clar, denies claimant's petition, and discharges the alternative writ.

SUMMARY JUDGMENT

Partial summary judgment is authorized by Code of Civil Procedure section 437c, which provides in relevant part that a motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. [¶] ... If it appears that the proof supports the granting of such motion as to some but not all the issues involved in the action ... the court shall, by order, specify that such issues are without substantial controversy. At the trial of the action the issue so specified shall be deemed established and the action shall proceed as to the issues remaining."

■ Review of the trial court's determination involves pure matters of law: Reassessment of the legal significance of the documents upon which the trial court acted. The reassessment normally proceeds in one or more of three consecutive steps:

(1) *Analyze the pleadings.* "Papers submitted on a motion for summary judgment must be directed to the issues raised by the pleadings." (*Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App. 3d 628, 635 [164 Cal.Rptr. 621], citing *Keniston* v. *American Nat. Ins. Co.* (1973) 31 Cal.App.3d 803, 812 [107 Cal.Rptr. 583].) In addition, a *defendant's* motion for summary judgment "necessarily includes a test of the sufficiency of the complaint .... Motions for summary judgment in such situations have otherwise been allowed as being in legal effect motions for judgment on the pleadings." (*C. L. Smith Co.* v. *Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 745 [135 Cal.Rptr. 483]; cf. also *Brown* v. *Critchfield* (1980) 100 Cal.App.3d 858, 862, fn. 1 [161 Cal.Rptr. 342]; *Bowden* v. *Robinson* (1977) 67 Cal.App.3d 705, 710 [136 Cal.Rptr. 871]; *Kessler* v. *General Cable Corp.* (1979) 92 Cal.App.3d 531, 535-536 [155 Cal.Rptr. 94].)

(2) *Examine the moving parties' showing.* "'Summary judgment is proper *only* if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor ....'" (*Weaver* v. *Superior Court* (1979) 95 Cal.App.3d 166, 183 [156 Cal.Rptr. 745], quoting from *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785], with italics added.) Where, as here, the moving party is a defendant he must either negate a necessary element of the plaintiff's case or state a complete defense. (*Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland,*

*Teerlink & Bell* (1977) 70 Cal.App.3d 331, 338 [138 Cal.Rptr. 670].)
If the moving party did not make the necessary showing, then (without
consideration of triable issues of material fact) the summary judgment
should have been denied. (Cf., e.g. *Albertini* v. *Schaefer* (1979) 97
Cal.App.3d 822, 831 [159 Cal.Rptr. 98]; *Tresemer* v. *Barke* (1978) 86
Cal.App.3d 656, 662-663 [150 Cal.Rptr. 384]; *Beech Aircraft Corp.* v.
*Superior Court* (1976) 61 Cal.App.3d 501, 520 [132 Cal.Rptr. 541].)
If (but only if) the moving parties are found to have made the necessary
showing, then,

(3) *Examine the responding parties' showing in opposition* to deter-
mine whether it created any triable issue as to a fact *material to the
moving parties' showing*: "[N]o amount of factual conflicts upon other
aspects of the case will affect the result . . . ." (*Frazier, supra*, 70 Cal.
App.3d 331, 338.) If there was a triable issue of material fact summary
judgment should have been denied.

It is the general rule with respect to steps (2) and (3), that the mov-
ing parties' declarations should be construed strictly and the responding
parties' liberally. (Cf., e.g., *Pupko* v. *Bank of America* (1981) 114 Cal.
App.3d 495, 498 [170 Cal.Rptr. 615]; *Calva Products* v. *Security Pa-
cific Nat. Bank* (1980) 111 Cal.App.3d 409, 415 [168 Cal.Rptr. 582].)

### A. *Pleading*

Claimant's complaint separately stated two counts, the first for
negligence and the second for strict product liability. The trial court
granted Clar's summary judgment motion "as to the second cause of ac-
tion (strict liability)."

The second count alleged in pertinent part that Batavia was the agent
and employee of Joe Clar & Sons; the press was manufactured by
Johnson Machine & Press Corporation.

Clar was at relevant times "engaged in the business of selling at retail
or wholesale to manufacturers at its principal place of business . . . the
hereinabove described press manufactured, designed and assembled by
Defendants, JOHNSON . . . ."

Claimant's employer purchased the press from Clar.

At the time of purchase the press "was defective and unsafe for its intended purposes in that the press, manufactured, designed and supplied by Defendants and each of them, for retail sale was purchased by the employer and used by ... [claimant] in its normal and intended manner when said press triggered and crushed ... [claimant's] hands."

Claimant "neither knew, nor had reason to know that at the time of his use of the press, or at any time prior to the accident ..., of the existence of the foregoing described defect.

"[O]n or about July 26, 1976, ... [claimant] was at his place of employment ... and was using the hereinabove described press for one of its intended manufacturing uses ..., and during the course of said use, and as a proximate result of the defect hereinabove described, the press triggered causing ... [claimant's] hands to be crushed."

As a result claimant was caused pain and suffering and incurred medical expenses and loss of income and of ability to earn.

Claimant's complaint thus suggests on its face that Clar was, or was equivalent to, a retailer engaged in the initial distribution of Johnson presses. On its face the count sufficiently outlines a theory of strict product liability against Clar. (Cf. 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 497, pp. 2157-2158; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168].)

### B. *Showing by Clar*

■ Within the frame of reference provided by the second count of the complaint Clar was required, in support of its motion for summary judgment, to negate a necessary element of petitioner's strict products liability theory or to state a complete defense to it. (*Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell, supra,* 70 Cal.App.3d 331, 338.) To do so it was entitled, on this record, to rely on declarations, depositions, and any matters admitted in the complaint. (Cf. Code Civ. Proc., § 437c; *Stevens* v. *Cessna Aircraft Co.* (1981) 115 Cal.App.3d 431, 434 [170 Cal.Rptr. 925]; *Brown* v. *City of Fremont* (1977) 75 Cal.App.3d 141, 146 [142 Cal.Rptr. 46].)

In factual support of its motion Clar submitted only a declaration executed by Batavia, excerpts from a deposition given by one Arthur

LaRosa, and counsel's declaration that the excerpts are true and correct copies and that Arthur LaRosa was "half owner of Alerco."

Batavia declared: "I was an employee of JOE CLAR & SONS in 1976 and was involved in the sale by JOE CLAR & SONS of the 1962 Johnson 45-ton punch press which is the subject of this lawsuit. JOE CLAR & SONS purchased the machine in question on April 21, 1976, from Morton Machinery Company, another used machinery dealer.

"The press was shipped directly from Morton to the plaintiff's employer, Alerco, on or about April 22, 1976. The machine was never in the possession of JOE CLAR & SONS. No representative from JOE CLAR & SONS ever inspected, used, modified or repaired the machine. JOE CLAR & SONS did not produce, manufacture or otherwise supply any component parts of the machine separately.

"Mr. LaRosa's employer, Alerco, purchased the press 'as is.' At no time did any representative of JOE CLAR & SONS make any representation to any parties at Alerco regarding the quality or safety of the machine in question.

"JOE CLAR & SONS is a dealer in used machinery. It has no direct connection with the manufacturer of the machine in question. The only connection JOE CLAR & SONS had with the machine in question was purchasing the machine from Morton Machinery Company and having it forwarded to Alerco and receiving payment thereon.

"Prior to the purchase of the machine, I did speak to Mr. Mark Rogo of Morton Machinery Company very briefly. The invoice from Morton Machinery was stamped with provisions referring to the installation and safety precautions and also refer to a hold harmless agreement. I had no discussions with Mr. Rogo concerning safety devices or hold harmless agreements. These provisions had never been included in any prior transactions between JOE CLAR & SONS and Morton and no representative of JOE CLAR & SONS ever agreed to any such provisions. The sales contract between Morton and JOE CLAR & SONS which showed the press had been shipped directly to Alerco contained no hold harmless agreement or provisions regarding safety devices."

In his deposition excerpts Arthur LaRosa said that he had bought other used machinery from Clar, "twice for sure": a stacker and a shearer; that he had called "a good five machine dealers" looking for

the press he ultimately bought from Clar; acknowledged that he asked Clar for a used 45-ton press and that Clar did not have such a press in stock but obtained it for him from Morton; confirmed that the press was shipped to him directly from Morton, and recalled that the machine was delivered three or four months before the accident; that Clar gave him a thirty-day "warranty" or right to return the machine if dissatisfied; acknowledged that the machine was sold to him "as is," and that he inspected it when it arrived and concluded that "it looked safe." He stated that he did not at the time "determine the need for any additional safety devices on the machine." He acknowledged that he had assumed that used machinery might be delivered without safety devices and that it would be up to him to install such devices if he considered it necessary.

In sum, Clar's showing was that it was a dealer in used machinery and that in the ordinary course of its business it bought the punch press and then sold it to claimant's employer, but that Clar never saw or handled the punch press, had no direct connection with its manufacturer, and expressly disclaimed any representation as to its condition, and that claimant's employer considered Clar just one of several comparable dealers which might have been able to furnish a used punch press and did not rely on Clar to make the punch press safe. All parties assume for the purpose of argument that the punch press was defective and that the defect or defects caused claimant's injuries. Clar adequately shows that it did not cause the defect or defects, but the source of the defect or defects is not otherwise identified.

The essence of Clar's argument is that *regardless* whether the defect or defects are attributable to the initial design and manufacture of the punch press or to subsequent modification, dilapidation, or misuse, and *regardless* whether Clar might ultimately be found to have been *negligent* in furnishing a defective punch press, Clar should not be held *strictly* liable for claimant's injuries. The questions raised by Clar's argument, as restated here, have not yet been comprehensively resolved in California or nationwide. (Cf., generally, Annot. (1973) 53 A.L.R.3d 337.)

1. *Initial defect hypothesis*

At its birth in 1963 (or, arguably, 19 years earlier in Justice Traynor's concurrence in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-468 [150 Cal.Rptr. 436]), the California law of strict

products liability focused on the *manufacturer*: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) A substantial part of the subsequent development of the California rules has been addressed to the question *who*, apart from the manufacturer, should be subject to strict liability for defects in the initial design or fabrication of the product. The generalized answer has been that anyone identifiable as "an integral part of the overall producing and marketing enterprise" for the product (*Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d 256, 262) should be subject to such liability: "It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability." (*Kasel* v. *Remington Arms Co.* (1972) 24 Cal.App.3d 711, 725 [101 Cal.Rptr. 314].) *Kasel* held that a company whose licensee and affiliate manufactured the defective product was an integral part of the marketing enterprise for this purpose, and listed other such "integral components of the particular enterprise responsible for placing alleged defective products on the market: a lessor (*McClaflin* v. *Bayshore Equipment Rental Co.*, 274 Cal.App.2d 446 ... [stepladder] and *Price* v. *Shell Oil Co.*, 2 Cal.3d 245 ... [gasoline truck]); a developer (*Kriegler* v. *Eichler Homes, Inc.*, 269 Cal.App.2d 224 ... [a builder engaged in mass tract development of homes]); a licensee (*Garcia* v. *Halsett*, 3 Cal.App.3d 319 ... [a launderette owner who was said to have licensed the use of a washing machine to plaintiff]); a retailer (*Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d 256 [retailer of a defective automobile]); and a wholesale-retail distributor (*Barth* v. *B. F. Goodrich Tire Co.*, 265 Cal.App.2d 228 ... [who merely distributed tires from his stock on order of the manufacturer])." (24 Cal.App.3d at p. 724.)

Were it to be hypothesized that the defect or defects in the punch press which injured claimant in this action were attributable to design or fabrication of the press by the original manufacturer, then the narrow question would be whether Clar should be deemed, in the requisite sense, an integral component of the enterprise which placed the press on the market. We do not believe that he should.

Nationwide, the question whether a dealer in used products should be strictly liable for a defect attributable to the initial design or fabrication of the used product has produced a split of authority. (Cf., e.g., *Turner v. International Harvester Company* (1975) 133 N.J. Super. 277 [336 A.2d 62] [liable]; *Tillman v. Vance Equipment Co.* (1979) 286 Ore. 747 [596 P.2d 1299] [not liable]; Note, *Sales of Defective Used Products: Should Strict Liability Apply?* (1979) 52 So.Cal.L.Rev. 805 [should be liable]; Note, *Protecting the Buyer of Used Products: Is Strict Liability for Commercial Sellers Desirable?* (1981) 33 Stan.L. Rev. 535 [should not be liable].)

In California the question was encountered in *Tauber-Arons Auctioneers Co. v. Superior Court* (1980) 101 Cal.App.3d 268 [161 Cal. Rptr. 789], which held that a used-machinery auctioneer should not be held strictly liable for a defect attributable to the initial manufacturing process. Tauber-Arons, which was in the business of auctioning off used machinery and equipment, conducted an auction of the machinery of Henry Engineering Company which was going out of business. Claimant's employer bought a Forsberg planer "as is," at the auction; title to the planer was transferred directly from Henry to claimant's employer. For conducting the auction, Tauber-Arons received a flat fee from Henry. The planer was defective; the defect, deemed created by the original manufacturer, caused an injury to claimant in the course of his employment. Claimant sued Tauber-Arons and others and obtained an adjudication that Tauber-Arons "'was a marketer, in the chain of commercial marketing of the defective planer, so as to be liable to plaintiff for product liability.'" (*Tauber* at p. 272.)

*Tauber-Arons* sought and obtained a writ of mandate.

The Court of Appeal acknowledged that "the fact that in this case petitioner acted as an agent in the conduct of the sale," and thus never had title to the planer, "is not controlling," but concluded that "[w]hat is significant ... is ... the requirement that defendant have a participatory connection with the enterprise which 'created consumer demand for and reliance upon' the particular 'injury-producing product' ..., not just products of the same classification." (101 Cal.App.3d at p. 276.) "The above California cases make it clear that the marketing enterprise, participation in which would justify imposition of strict liability for a defect created by the manufacturer, is the enterprise by which initial distribution of the particular manufacturer's products to the

consuming public is effected. Such authorities do not, therefore, support imposition of strict liability in the case at bench where the only connection between petitioner and Forsberg products is its 'random and accidental role' (*Garcia v. Halsett, supra*, 3 Cal.App.3d at p. 326 [82 Cal.Rptr. 420]) in transferring the planer from one consumer to another." (101 Cal.App.3d at p. 277.) "There are no California cases dealing with the question whether a defendant who is in the business of selling secondhand products, who has not modified or rebuilt them, is strictly liable for defects in their original manufacture or design. We must look, therefore, for guidance in this respect in the decisions from other jurisdictions and in the policy of this state which underlies the extension of strict liability not only to manufacturers but to all those who participate as 'an integral part of the overall producing and marketing enterprise' of the product in question. (*Vandermark v. Ford Motor Co., supra*, 61 Cal.2d at p. 262.)" (101 Cal.App.3d at pp. 277-278.) "In *Tillman v. Vance Equipment Co.* (1979) 286 Ore. 747 . . ., the Oregon Supreme Court specifically considered the question of the liability of a seller of used machinery 'for a defect in a used crane when that defect was created by the manufacturer.' (*Id.*, at p. 1301.) The defendant, a 'used equipment dealer' (*id.*, at p. 1300), purchased a used crane and immediately resold it 'as is' to plaintiff's employer. Plaintiff was injured while attempting to grease the gear box and claimed that the design of the box was defective. The trial court judgment for defendant was affirmed. The court noted the decision of the New Jersey Superior Court in *Turner* as an example of a decision making risk-spreading the controlling consideration in the imposition of enterprise liability. After stating that it had never been willing to rely solely on this element, the Oregon Supreme Court continued in *Tillman* (596 P.2d at pp. 1303-1304): 'Instead, we have identified three justifications for the doctrine: ". . . [C]ompensation (ability to spread the risk), satisfaction of the reasonable expectations of the purchaser or user (implied representational aspect), and over-all risk reduction (the impetus to manufacture a better product). . ."'" *Fulbright v. Klamath Gas Co.*, 271 Or. 449, 460, 533 P.2d 316, 321 (1975).

"'While dealers in used goods are, as a class, capable like other businesses of providing for the compensation of injured parties and the allocation of the cost of injuries caused by the products they sell, we are not convinced that the other two considerations identified in *Fulbright* weigh sufficiently in this class of cases to justify imposing strict liability on sellers of used goods generally.'" (101 Cal.App.3d at pp. 279-280.)

"'For the reasons we have discussed, we have concluded that the relevant policy considerations do not justify imposing strict liability for defective products on dealers in used goods, at least in the absence of some representation of quality beyond the sale itself or of a special position vis-a-vis the original manufacturer or others in the chain of original distribution. Accord: *Rix* v. *Reeves*, 23 Ariz.App. 243, 532 P.2d 185 (1975). [Fns. omitted.]'" (101 Cal.App.3d at p. 282.) *Tauber-Arons* concludes that "[a]s regards defects created by the original manufacturer, *Tillman* states a sound rule limiting liability of dealers in used equipment.... The ordinary used products dealer ... will not be strictly liable for such defects created by the manufacturer." (101 Cal.App. 3d at p. 282.)

"The rule stated in *Tillman* is consistent with the policy underlying the doctrine of strict liability as developed in this state and most recently announced by our Supreme Court in *Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722]. In holding the volume lessor of tank trucks strictly liable for defects in the equipment provided therewith, the court stated that 'the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them.' (*Id.,* at p. 251.) The court did not, however, abandon all other considerations. In particular, it affirmed the continued vitality of the requirement that the imposition of liability 'works no injustice to the defendants,' saying in this respect (*id.,* at pp. 253-254): 'However, since we reason by analogy, we make clear that the doctrine should be made applicable to lessors in the same way as we have made it applicable to sellers. In *Greenman* [ v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57] ... *supra,* we fastened liability on a manufacturer "when an article *he places on the market,* ... proves to have a defect...." (59 Cal.2d at p. 62, italics added.) In *Vandermark* we again emphasized the necessity for a continuous course of business as a condition to application of the rule: "Retailers like manufacturers are *engaged in the business* of distributing goods to the public.... Strict liability ... works no injustice to the defendants, *for they can adjust the costs of such protection between them in the course of their continuing business relationship.*" (61 Cal.2d at pp. 262-263.)'

"The ordinary used machinery dealer has no continuing business relationship with the manufacturer in the course of which he can adjust the cost of protection from strict liability. Consequently, the rationale which underlies *Vandermark* simply is inapplicable to such a dealer.

Moreover, the risk reduction which was sought in *Vandermark* on the assumption that 'the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end' (61 Cal.2d at p. 262), as pointed out by the opinion in *Tillman*, is simply unattainable because the 'used-goods dealer is normally entirely outside the original chain of distribution of the product. . . .' (*Tillman* v. *Vance Equipment Co., supra*, 596 P.2d at p. 1304.)" (101 Cal.App.3d at p. 283, fn. omitted.) *Tauber-Aron*'s reasoning is sound.

### 2. *Subsequent defect hypothesis*

*Tauber-Arons* deemed it "unnecessary to decide whether petitioner may be strictly liable if the defect proven is the result of subsequent modification, dilapidation or misuse." (101 Cal.App.3d at p. 284.) Clar has eliminated the possibility that *it* created the defect; therefore this court need not address the holding, in *Green* v. *City of Los Angeles* (1974) 40 Cal.App.3d 819, 838 [115 Cal.Rptr. 685], that a seller of used machinery who has extensively modified the machinery may be deemed "tantamount to a manufacturer" and subject to strict liability as such. But the hypothesis that the defect in the punch press is attributable to "modification, dilapidation or misuse" subsequent to manufacturer but prior to Clar's sale to claimant's employer remains to be dealt with.

There is no claim that this was an isolated transaction. (Cf. *Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 639-640 [105 Cal.Rptr. 890].) Clar was in the day-to-day business of selling machines such as this. Narrowly, the question is whether a commercial dealer in used goods should be strictly liable, independent of the initial marketing and distribution enterprise and absent any showing that he caused or created the defect, for injury caused by a defect in a used product which he sold in the regular course of his business. It is immediately apparent that the dealer who is *not* integrally involved in the initial manufacturing-marketing-distributing process will lack the initial retailer's or distributor's ability to join other integral members of the initial process and to require them to "adjust the costs of such protection between them in the course of their continuing business relationship." (*Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d 256, 263.) Nor can the relationship of a dealer in used goods to the random and perhaps unidentifiable prior misuser of the product be validly analogized to the initial retailer's relationship to the manufacturer: there may

be no business relationship at all, and few, if any, of the policy considerations applicable to the manufacturer would apply to the random misuser. But these observations do not necessarily provide a complete answer.

The Restatement Second of Torts offers a *simple* answer; in terms its strict liability rule applies to *any* sale of a defective product:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." (Rest., 2d Torts, § 402A; cf. *Turner* v. *International Harvester Company, supra,* 133 N.J. Super. 277 [336 A.2d 62, 71] ["With this 'unreasonably dangerous' element intact, the Restatement rule is as applicable to the sale of a used product as to the sale of a new product"]; *Hovenden* v. *Tenbush* (Tex.Civ.App. 1975) 529 S.W.2d 302, 306 ["The Restatement imposes liability on any person who 'sells' a defective product which caused injury to person or property"]; but cf. *Peterson* v. *Lou Bachrodt Chevrolet Company* (1975) 61 Ill.2d 17 [329 N.E.2d 785, 787] ["If strict liability is imposed upon the facts alleged here, the used car dealer would in effect become an insurer against defects which had come into existence after the chain of distribution was completed, and while the product was under the control of one or more consumers"].)

But California courts have not deemed themselves invariably bound by section 402A. (Cf., e.g., *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 123-135 [104 Cal.Rptr. 433, 501 P.2d 1153] [rejecting the Restatement's "unreasonably dangerous" element]; *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 253 [85 Cal.Rptr. 178, 466 P.2d 722] [strict liability not limited to sellers].) An approach more consistent with the

California cases would be to determine, in light of relevant policy considerations, whether the commercial dealer in used goods *should* be strictly liable.

The Supreme Court has described the evolution of California strict products liability, at least insofar as it relates to the *manufacturer* and to those integral to the *initial marketing and distribution enterprise*, as follows: "Tort law has evolved from a legal obligation initially imposed without 'fault,' to recovery which, generally, was based on blameworthiness in a moral sense. For reasons of social policy and because of the unusual nature of defendant's acts, liability without fault continued to be prescribed in a certain restricted area, for example, upon keepers of wild animals, or those who handled explosives or other dangerous substances, or who engaged in ultrahazardous activities. Simultaneously, and more particularly, those who were injured in the use of personal property were permitted recovery on a contract theory if they were the purchasers of the chattel or were in privity. Subsequently, liability was imposed in negligence upon the manufacturer of personalty in favor of the general consumer. (For a comprehensive historical review, see Prosser, Law of Torts (4th ed. 1971) § 96, pp. 641-644; 2 Harper & James, The Law of Torts (1956) § 12.2 and foll., p. 747 and foll.) Evolving social policies designed to protect the ultimate consumer soon prompted the extension of legal responsibility beyond negligence to express or implied warranty. Thus, in the area of food and drink a form of strict liability predicated upon warranty found wide acceptance. Warranty actions, however, contained their own inherent limitations requiring a precedent notice to the vendor of a breach of the warranty, and absolving him from loss if he had issued an adequate disclaimer.

"General dissatisfaction continued with the conceptual limitations which traditional tort and contract doctrines placed upon the consumers and users of manufactured products, this at a time when mass production of an almost infinite variety of goods and products was responding to a myriad of ever-changing societal demands stimulated by widespread commercial advertising. From an historic combination of economic and sociological forces was born the doctrine of strict liability in tort.

"We, ourselves, were perhaps the first court to give the new principle judicial sanction. In *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 ..., confronted with injury to an ultimate consumer caused by a defective power tool, we fastened strict liability on a manufacturer

who placed on the market a defective product even though both privity and notice of breach of warranty were lacking. We rejected both contract and warranty theories, express or implied, as the basis for liability. Strict liability, we said, did not rest on a consensual foundation but, rather, on one created by law. The liability was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations in the negligence and warranty remedies. Our avowed purpose was 'to insure that the costs of injuries resulting from defective products are borne by the manufacturer that put such products on the market rather than by the injured persons who are powerless to protect themselves.' (*Id.*, at p. 63.) Subsequently, the *Greenman* principle was incorporated in section 402A of the Restatement Second of Torts, and adopted by a majority of American jurisdictions. (Prosser, *supra*, at pp. 657-658.)" (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 732-733 [144 Cal.Rptr. 380, 575 P.2d 1162].)

The University of Southern California (U.S.C.) notewriter (Note, *supra*, 52 So.Cal.L.Rev. 805) has broken the policy predicates for strict products liability down into five more or less distinct categories, support for each of which can be found in *Greenman* or in subsequent California cases. The proposition that a seller of used goods should be strictly liable, independent of the initial manufacturing-marketing-distributing cycle should be examined in light of each of the five categories.

a. *Enterprise liability*

"[T]he principal policy justification for the strict liability doctrine" (Note, *supra*, 52 So.Cal.L.Rev., at p. 811) is said to be "[t]he policy of enterprise liability" which "forces the entrepreneur to include certain enterprise-related costs, such as the costs of injuries caused by defective products, as part of the cost of doing business. This is because the enterprise has 'created the risk and reaped the profit by placing the product in the stream of commerce.'" (*Id.*, at p. 812, fn. omitted; cf. also *Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d 57, 63; *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22, 30, 34 [136 Cal.Rptr. 574]; *Cronin* v. *J.B.E. Olson Corp., supra*, 8 Cal.3d 121, 133; *Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d 256, 262; *Escola* v. *Coca Cola Bottling Co., supra*, 24 Cal.2d 453, 462 et seq. (conc. opn. of Traynor, J.).) *Daly* would add the consideration that the entrepreneur characteristically seeks to stimulate demand (and thus, presumably, profit), and thereby necessarily exacerbates any potential risk attributable to a

product defect, by "wide-spread commercial advertising" and other marketing techniques. (Cf. *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 732 [144 Cal.Rptr. 380, 575 P.2d 1162].) The assumption is that the entrepreneur will pass the costs of injuries along to the consumer in the form of increased prices for more dangerous products and that the consumer will be more likely to buy safer goods because they will be relatively less expensive. This economic process will, it is suggested, eliminate "the financial incentive for businesses to use designs and procedures that impose a societal cost in personal injuries that is far out of proportion to the amount saved by the company." (Note, *supra*, 52 So.Cal.L.Rev., at pp. 813-814.)

The U.S.C. notewriter concludes that the enterprise liability doctrine supports imposition of strict liability on sellers of used products, and hypothesizes that such sellers will simply insure and pass along the premiums in increased prices. (*Id.*, at pp. 825-826.) The Stanford notewriter (Note, *supra*, 33 Stan.L.Rev. 535) disagrees, fearing that increased prices for used products will simply drive the buyer to the former owner of the goods, or to some other random seller who cannot be made subject to strict liability rules (cf. *Balido* v. *Improved Machinery, Inc., supra*, 29 Cal.App.3d 633, 639-640), and that defective product risks would thus be increased rather than decreased. (Note, *supra*, 33 Stan.L.Rev., at pp. 537-539.) When the probability (developed below) that it will be proportionately far more expensive for a used-goods dealer than for the original manufacturer to make a product safer is added in, the safer-is-cheaper hypothesis may prove to be inapplicable in the used-goods market. Another distinction to be considered is that none but the most specialized of used-goods dealers seeks systematically to increase demand for specific products by advertising and marketing techniques. The used-goods dealers of the world primarily pitch low prices. By the same token buyers of used goods are, like any shopper, looking for the best parlay of quality and low price but are consciously trading off the quality to get the price. Any rule which would force used-goods dealers substantially to raise their prices would tend simply to drive them out of business and to leave the market to the random seller.

In sum, the enterprise liability doctrine, while superficially applicable to any merchant, by no means compels application of strict liability to dealers in used goods.

b. *Deterrence*

The U.S.C. notewriter's second policy factor is all but indistinguishable from the enterprise liability doctrine: "'It is to the public interest to discourage the marketing of products having defects that are a menace to the public.' [*Escola* v. *Coca Cola Bottling Co., supra*, 24 Cal.2d 453, 462 (conc. opn. of Traynor, J.).]" (Note, *supra*, 52 So.Cal.L.Rev., at p. 814.) "Strict liability operates to reduce injury costs by creating an economic incentive for safety." (*Id.*, at p. 815.)

The U.S.C. notewriter deems the deterrence rationale "especially compelling in cases involving used products." (Note, *supra*, 52 So.Cal. L.Rev. at p. 826.) "Because used products are more likely to require repairs prior to sale, the need for careful inspection is greater than with new products." (*Ibid.*) Once again, however, the U.S.C. notewriter appears to underestimate the proportionate cost to a used-goods dealer of routinely inspecting and repairing used products, particularly those which (like punch presses) may be expected to be both complex and potentially dangerous, and to miscalculate the ultimate effect of imposing such a cost on the used-goods dealer. The Stanford notewriter points out, persuasively, that a used-goods dealer's ability to repair defects should not be exaggerated. (Cf. Note, *supra*, 33 Stan.L.Rev. at pp. 539-542.) It would be a rare used-goods dealer (other than the specialist who, say, sells only previously owned IBM typewriters) who would have or could afford anything comparable to a factory reconditioning process. This is not to say that the public would not benefit by such inspection and repair. But it seems unrealistic to conclude that the broad-line used goods dealer would normally undertake such inspection or repair even if the alternative were strict liability.

So far as the hope of shifting consumer demand to safer products is concerned, it has been repeatedly observed that consumers of used goods are concerned primarily with price and that their expectations as to quality (including safety) are consciously reduced. (Cf. *Tauber-Arons Auctioneers Co.* v. *Superior Court, supra*, 101 Cal.App.3d 268, 280-281.) Such a consumer would select a safer used product, in general, only if the price were right. A used-goods dealer would find it difficult or impossible to assimilate the cost of ad hoc inspection and repair into an attractive price, the demand-shifting function would not be served by imposition of strict liability.

## c. *Risk distribution*

"[E]conomic losses from personal injuries caused by defects are an inevitable cost of placing a product on the market. [It is] argued that these losses are least harmful if they are broadly distributed, rather than falling full-force on the unfortunate victims of this ever-present risk." (Note, *supra*, 52 So.Cal.L.Rev. at p. 816; cf. also *Ray* v. *Alad Corp., supra*, 19 Cal.3d 22, 30-31, 33; *Price* v. *Shell Oil Co., supra*, 2 Cal.3d 245, 251; *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 18-19 [45 Cal.Rptr. 17, 403 P.2d 145]; *Escola* v. *Coca Cola Bottling Co., supra*, 24 Cal.2d 453, 462 (conc. opn. of Traynor, J.).) Of course the orthodox method of distribution is for the primary burden of the loss to be placed on the insurable seller, for the seller to insure and to spread the premium cost by price increments, and for the insurance carrier to spread the loss cost by premium increments based on overall loss experience.

Some form of the risk distribution rationale could be used to justify imposing liability on any insurable party to an injury-causing event. The U.S.C. and Stanford notewriters agree that the rationale would apply to a dealer in used goods. (Note, *supra*, 52 So.Cal.L.Rev., at p. 826; Note, *supra*, 33 Stan.L.Rev., at pp. 543-544.) The risk-distribution rationale apparently sufficed to persuade the New Jersey court in *Turner* v. *International Harvester Company, supra*, 133 N.J.Super. 277 [336 A.2d 62] simply to apply the literal language of Restatement, section 402A to a dealer in used goods; *Tillman* and *Tauber-Arons* doubted that the risk-distribution rationale would support strict liability. (Cf. *Tauber-Arons Auctioneers Co.* v. *Superior Court, supra*, 101 Cal.App. 3d 268, 280.) The Stanford notewriter suggests that used-goods dealers are sometimes marginally profitable and unable to insure properly (*ibid.*), but this is by no means empirically established. But the very pervasiveness of the risk distribution rationale suggests that it is probably insufficient, by itself, to justify *strict* liability.

## d. *Practicality*

"One of the reasons for establishing strict liability 'was to relieve the plaintiff from the problems of proof inherent in pursuing negligence and warranty remedies ....'" (Note, *supra*, 52 So.Cal.L.Rev., at p. 817, citing *Cronin* v. *J.B.E. Olson Corp., supra*, 8 Cal.3d 121, 133; cf. also *Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d 256, 262; *Ray* v. *Alad Corp., supra*, 19 Cal.3d 22, 31-33; *Daly* v. *General Motors Corp.,*

*supra*, 20 Cal.3d 725, 732-733, 736; *Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d 57, 63.)

It stands to reason (1) that the used-goods dealer who sold the defective product will be easier to find than the unidentified and perhaps unidentifiable intermediate owner or user who created the defect by modification, unrepaired dilapidation, or misuse, and (2) that it will be easier to fix the primary impact of the loss on the dealer by strict liability rules than by theories of negligence or breach of warranty. But ease of recovery is not really a *rationale* for strict liability; more precisely it describes the *effect* strict liability was expected to have. Obviously if ease of recovery *were* a persuasive rationale for strict liability then strict liability would be the universal rule. Instead it has been determined, on the basis of *other* policy considerations, that there should *be* ease of recovery and then, to that end, a strict liability rule has been adopted. Perhaps ease of recovery can be converted into a rationale by positing that an easier recovery will be less *costly* and therefore that the net return to the claimant will be greater without commensurate increase in the cost to the defendant or his carrier (cf. Note, *supra*, 33 Stan.L.Rev. at p. 536, fn. 7), but this hypothesis requires unsubstantiated assumptions as to relative cost (cf. *ibid.*) and, again, the preliminary assumption, based on *other* considerations, that the claimant *should* have maximum recovery against the defendant.

e. *Implied representation*

"Another popular justification for strict liability postulates an implied representation of safety accompanying all products by their very presence on the market." (Note, *supra*, 52 So.Cal.L.Rev. at p. 818, citing *Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d 57, 64.) This notion "fails to provide any explanation for the transition from warranty theories of liability to strict liability." (Note, *supra*, 52 So.Cal.L.Rev., at p. 818.) But "[i]n spite of its limitations, the concept of an implied representation of safety is probably valid in most situations." (*Id.*, pp. 818-819; see also *Escola* v. *Coca Cola Bottling Co., supra*, 24 Cal.2d 453, 467 (conc. opn. of Traynor, J.).)

The U.S.C. notewriter suggests that even though a "buyer of a used product may often have lower expectations than a buyer of a new product, he is still entitled to expect that there be no latent safety defect in the used product." (Note, *supra*, 52 So.Cal.L.Rev. at p. 827.)

This rationale seems weak for several reasons. If the representation is simply implied in *law*, it seems to add nothing to either the strict liability rule or its rationale. If, as the phraseology suggests, there is in *fact* a representation of safety implicit in placing a product (new or used) on the market, then we have a conflict of theories. Representation is not the stuff of strict liability. The implied representation has not been relied on since *Greenman*, the rhetoric of which was designed to bridge a gap from warranty to strict liability. Finally, as *Tillman* and *Tauber-Arons* point out, in the real world a sale of used goods simply does not create a high level of expectation of safety in the consumer. (*Tauber-Arons Auctioneers Co.* v. *Superior Court, supra*, 101 Cal.App.3d 268, 280-281, quoting from *Tillman* v. *Vance Equipment Co., supra*, 286 Ore. 747 [596 P.2d 1299, 1303-1304].)

It is noteworthy that the drafters of the recent Model Uniform Product Liability Act (an outgrowth of a joint study by federal agencies) "declined to impose liability on sellers of used products when they are '*in essentially the same condition as when* ... *acquired for resale.*' § 102A[3]. The official analysis to this section notes a 'slight majority of decisions indicate liability law does apply to sellers of used products,' but that different standards of care are applied to such sellers. Therefore, the drafters leave the resolution of liability for sellers of used products to 'other law of the state.'" (2 Frumer & Friedman, Products Liability (rev. 1981) § 16A[4][b][iv], pp. 3B-62-62.1.)

Perhaps (in buying, selling, and shipping the punch press sight unseen) Clar was negligent. But strict liability should not be extended to Clar.

### C. *Claimant's showing*

It remains to be determined whether claimant's showing raised a triable issue as to any fact material to the determination that Clar should not be strictly liable.

The following matters recited in claimant's showing, as thus liberally construed, appear to add to or in one sense or another to vary from Clar's factual showing:

Morton's invoice to Clar recited that the buyer (Clar) of the punch press would install at his expense all necessary safety precautions to meet a specified safety standard, and would indemnify "wholesaler"

(presumably Morton). It was the first time Clar had seen such a recitation. Morton did not tell Clar that the press was being sold "as is."

At the time it sold the punch press Clar was unaware of any safety precautions needed or required by state or federal standards for the press. Clar did nothing in response to the recitation in Morton's invoice. Clar had never added safety devices to punch presses during the time Batavia worked for them. Clar's "normal function" was to buy machinery and to sell it, without modifications. Clar acknowledged that "if you have" a maintenance history in the machine, "you forward it usually. We do."

Clar's invoice to claimant's employer specified a "30 Day Returnable Privilege." The invoice also contained printed disclaimers or warranties, liability, and guarantees.

The punch press was manufactured in 1962, more than 16 years before the accident. Inspection of the press after the accident disclosed that critical parts of the mechanism were worn or had been modified without the knowledge or consent of the manufacturer. In the opinion of an engineer for one of the defendants, deterioration of nonstandard parts inserted in the course of the modifications caused the accident. Apparently one of the critical parts had been replaced in 1970.

A representative of Clar told claimant's employer the punch press was in "operating condition, no defects, as far as he knew."

Morton's representative told Batavia that the punch press was "in good condition." Morton gave Clar a 30-day return privilege "because the machine was in such good condition."

Claimant's employer "needed a 45 ton press . . . and I didn't care if it was a Johnson or whatever, as long as it did the job."

Batavia acknowledged that he had sold "probably over a hundred" punch presses while working for Clar.

Several of these facts would be relevant to negligence. But in light of the analysis above, none of them creates an issue as to facts material to the question whether used-goods dealers in general, and Clar in particular, should be strictly liable for injuries due to defects not directly created or caused by the dealer.

The petition for writ of mandate or prohibition is denied. The alternative writ is discharged.

Poché, J., and McCullum, J.,* concurred.

A petition for a rehearing was denied September 18, 1981, and petitioner's application for a hearing by the Supreme Court was denied November 19, 1981. Bird, C. J., Tobriner, J., and Kaus, J., were of the opinion that the application should be granted.

---

*Assigned by the Chairperson of the Judicial Council.