Argued September 6, 1974, reversed and remanded April 1, 1975

# FULBRIGHT, *Appellant, v.* KLAMATH GAS COMPANY ET AL, *Respondents.*

533 P2d 316

*Glenn D. Ramirez,* of Ramirez & Hoots, Klamath Falls, argued the cause and filed a brief for appellant.

*Stanley C. Jones,* of Giacomini, Jones & Zamsky, Klamath Falls, argued the cause and filed a brief for respondents.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, BRYSON, and SLOPER, Justices.

HOLMAN, J.

Plaintiff brought an action to recover damages resulting from personal injuries suffered while using defendants' potato vine burner. The action is in two counts, one in negligence and the other in products liability. The trial court granted a nonsuit in

the products liability count and a directed verdict in the negligence count. Plaintiff appeals.

As is required in such situations, the facts will be recounted in a manner as favorable to plaintiff as the evidence will permit. Plaintiff was employed as a farm hand by a potato farmer in Klamath County. Defendants were in the business of selling propane gas, related gas appliances, and assorted camping equipment. Defendants furnished potato vine burners to farm customers free of charge as a means of promoting their sale of propane gas. Vine burners are used to burn vegetation prior to digging potatoes to prevent the potato vines from clogging the mechanical diggers.

A potato vine burner is a portable unit which consists of two large pressurized propane tanks mounted side by side in an open trailer frame. To the rear and connected to the pressurized tanks are located four burning units which direct an open flame towards the ground much like four large blow torches. Separating the propane tanks from the burners is a heat shield made of galvanized steel sheets, the purpose of which is to protect the tanks from direct contact with the high temperature of the open flame of the four burner units. The tanks are equipped with a safety pressure relief valve which was designed to open automatically when the internal tank pressure exceeded approximately 250 PSI. The valve would open if such pressures were attained and cause the release of propane gas and liquid into the air until the pressure fell below the valve's designed safety margin, at which point the valve would then close and reestablish the integrity of the pressurized tanks. This

unit was located approximately on the trailer center-line on the top of the two propane tanks.

The burner was towed up and down the field by a tractor operated by plaintiff. While the burner was being used in this manner, pressure in the propane tanks increased because of heat from the burners. When the pressure reached a critical level, the safety valve on top of the tanks was activated, and propane was released into the air and was ignited by the burners. Plaintiff was enveloped in the resulting flame.

The issue concerning the sufficiency of the evidence of negligence will be considered first. Plaintiff's allegations of negligence are as follows:

"(a) in failing to inspect and test said burner prior to turning it over to plaintiff's employer for use by plaintiff.

"(b) in failing to provide an adequate and safe shield to protect the propane gas lines and tank from the heat of the burners in their normal and intended use.

"(c) in failing to provide a safety shield for plaintiff operator in the event of an explosion of the gas lines or tanks.

"(d) in failing to instruct plaintiff either directly or through his employer of the dangers of the propane vine burner or of a manner for its safe operation.

"(e) in failing to provide safety devices to shut off the burners in case of overheating or dangerous circumstances arising from non-burning gas."

There was no evidence from which the jury could have found that a failure to inspect or test the burner in any way caused the accident. Nor was there any

evidence from which the jury could have found that it was practicable or possible to furnish a more adequate heat shield between the burners and the tanks, a shield for the operator or a device to shut off the burners in case the tanks became overheated.

■ However, there was evidence that a potato vine burner should not be used in a strong wind because of the presence and proximity of the highly flammable propane gas, the open flame, the high heat, and the general nature and character of the machine. There also was evidence that the wind was strong and that no warning had been given to plaintiff or to his employer concerning its use under such a circumstance. Plaintiff was using the machine for the first time and there was evidence from which it could be found that the manager of plaintiff's employer had no great familiarity with such a machine. It is the court's conclusion that the evidence was sufficient to raise a question of fact whether the defendants were negligent in providing the machine without warning of the potential danger associated with its use on windy days. The court believes a jury could find that there was sufficient chance of use by inexperienced persons on a windy day to justify a warning in the exercise of reasonable care. For this reason the judgment of the trial court must be reversed and the case remanded for a new trial.

■ The more difficult question in the case is whether this is the kind of a situation which falls within the ambit of the products liability rationale. Plaintiff alleged the burner was defective because it was designed to release the propane gas into the air where it could become ignited when the tanks became overheated. Defendants contend there is no evidence that

the vine burner was defective in that there was no proof that it could have been designed in any manner which would have made it safer. Although there was no such evidence, there was proof by defendants that the burner should not have been used on a windy day and that there was no warning given concerning the danger of its use under such a condition. A failure to warn may make a product unreasonably dangerous. Comment *j.*, Section 402A, Restatement (Second) of Torts. *Phillips v. Kimwood Machine Co.,* 269 Or 485, 496-97, 525 P2d 1033 (1974). We believe there was evidence from which it could be found that the machine was dangerously defective because the defendants were charged with knowledge of its dangerous propensity and failed to warn plaintiff or his employer of its tendency to heat up on windy days and to discharge propane gas into the air. Defendants cannot escape because of lack of proof of defectiveness.

However, the more crucial problem is whether such lending of the burner comes within the rationale of products liability. Section 402A of the Restatement (Second) of Torts, which we have adopted with some minor modifications, provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible

care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

■ Defendants were not in the business of selling vine burners and did not sell one to plaintiff's employer. Plaintiff was not injured by anything which his employer purchased. The use of the vine burners was a bailment for mutual benefit because defendants promoted the sale of their product through the burner's use and plaintiff's employer was able to burn his potato vines. There are cases which hold that persons who are in the business of bailing for hire are subject to the rationale of strict liability because there is no substantial difference between moving defective products into the stream of commerce by sale and doing so by leases. In *Cintrone v. Hertz Truck Leasing and Rental Service,* 45 NJ 434, 212 A2d 769 (1965), the court stated:

"A sale transfers ownership and possession of the article in exchange for the price; a bailment for hire transfers possession in exchange for the rental and contemplates eventual return of the article to the owner. By means of a bailment parties can often reach the same business ends that can be achieved by selling and buying. The goods come to the user for the time being and he benefits by their use and enjoyment without the burdens of becoming and remaining the owner. The owner-lessor benefits by receiving the rent for the temporary use. *Vold, Sales, supra,* § 4, *p.* 24." 45 NJ at 447.

And the court went on to say:

"A bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the

stream of commerce in a fashion not unlike a manufacturer or retailer. In fact such a bailor puts the vehicle he buys and then rents to the public to more sustained use on the highways than most ordinary car purchasers. The very nature of the business is such that the bailee, his employees, passengers and the traveling public are exposed to a greater *quantum* of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer. We held in *Santor* the liability of the manufacturer might be expressed in terms of strict liability in tort. *Santor v. A. & M. Karagheusian, Inc., supra* (44 *N. J.*, at *pp.* 66-67); see also, *Restatement (Second), Torts,* § 402A, comment m, *pp.* 9-10 (*Tent. Draft No.* 10, 1964). By analogy the same rule should be made applicable to the U-drive-it bailor-bailee relationship * * *."

45 NJ at 450.

In *Price v. Shell Oil Co.*, 2 Cal 3d 245, 251-53, 85 Cal Rptr 178, 466 P2d 722 (1970), where a fuel truck was leased to plaintiff's employer, the court said as follows:

"Similarly we can perceive no substantial difference between *sellers* of personal property and *non-sellers*, such as bailors and lessors. In each instance, the seller or non-seller 'places [an article] on the market, knowing that it is to be used without inspection for defects, . . .' (*Greenman v. Yuba Power Products, Inc., supra*, 59 Cal2d at p. 62.) In the light of the policy to be subserved, it should make no difference that the party distributing the article has retained title to it. Nor can we see how the risk of harm associated with the use of the chattel can vary with the legal form under which it is held. Having in mind the market realities and the widespread use of the lease of personalty in today's business world, we think it makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers.

"'* * * * *.

"Nor are we dissuaded from our above conclusion by Shell's somewhat oblique argument that the Restatement Second of Torts in section 408 imposes on *lessors* of personal property liability only for negligence while in section 402A it imposes strict liability only on *sellers* of such property. This is no more than saying what is obvious —that the doctrine of strict liability as articulated in the Restatement was not made applicable against lessors or bailors. As we have explained, we think it should be, just as in *Elmore* [*v. American Motor Corp.*, 70 Cal2d 578] we thought it should be made applicable in favor of the 'bystander,' even though the authors of the Restatement refrained from expressing such a view.

"For the above reasons, we are of the opinion that the doctrine of strict liability in tort should be made applicable to bailors and lessors of personal property in the same manner as we have held it applicable to sellers of such property. Mindful of the purpose of such doctrine as explicated by us in *Greenman* and *Vandermark* [*v. Ford Motor Co.*, 61 Cal2d 256] and most recently in *Elmore* we can find no significant difference between a manufacturer or retailer who places an article on the market by means of a sale and a bailor or lessor who accomplishes the same result by means of a lease. (See *Cintrone v. Hertz Truck Leasing & Rental Service, supra*, 212 A.2d 769, 776.) In today's society with 'the growth of the business of renting motor vehicles, trucks and pleasure cars' *(Cintrone v. Hertz Truck Leasing & Rental Service, supra)* and the persistent advertising efforts to put one 'in the driver's seat' *(id.* at p. 776) we have no difficulty in finding the doctrine peculiarly applicable to the lessor of motor vehicles. The very reasons which impelled us to apply the doctrine in *Greenman* urge us to apply it in the instant case."

Also see *Stewart v. Budget Rent-A-Car Corp.*, 52 Hawaii 71, 470 P2d 240 (1970) (rented automobile); *contra, Speyer, Inc. v. Humble Oil and Refining Co.*, 275 F Supp 861 (D Pa 1968), *aff'd*, 403 F2d 766 (3d Cir 1968), *cert. denied*, 394 US 1015, 89 S Ct 1634, 23 L Ed 2d 41 (1969) (strict interpretation of word "seller").

There is also another line of authority which holds that the containers in which products are sold are so closely identified with the sale of the product that the container's dangerous propensities are the equivalent of the dangerous propensities of the product itself. Comment *h.* to § 402A Restatement (Second) of Torts states as follows:

> "The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from * * * the way in which the product is prepared or packed. No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. Where the container is itself dangerous, the product is sold in a defective condition. Thus a carbonated beverage in a bottle which is so weak, or cracked, or jagged at the edges, or bottled under such excessive pressure that it may explode or otherwise cause harm to the person who handles it, is in a defective and dangerous condition. The container cannot logically be separated from the contents when the two are sold as a unit, and the liability stated in this Section arises not only when the consumer drinks the beverage and is poisoned by it, but also when he is injured by the bottle while he is handling it preparatory to consumption."

Professor Prosser in his work Law of Torts 659,

Products Liability § 99 (4th ed 1971), has the following to say:

> "* * * The tide of decisions has swept away the highly metaphysical distinction between the product and the container in which it is sold, which used to perplex some courts in the food cases. The two are sold as an integrated whole, and it is inconceivable that anyone would buy one without the other. When a bottle of beer explodes and puts out the eye of the man about to drink it, surely nothing should be less material than whether the explosion is due to a flaw in the glass of the bottle or to overcharged contents." (Footnotes omitted.)

The futility of trying to separate the two in implied warranty situations is demonstrated by *Vallis v. Canada Dry Ginger Ale, Inc.,* 190 Cal App 2d 35, 39, 11 Cal Rptr 823 (1961), and *Haller v. Rudmann,* 249 App Div 831, 292 NYS 586, 587 (1937). The case of *Kroger Co. v. Bowman,* 411 SW2d 339, 341-43 (Ky 1967) is in agreement insofar as products liability cases are concerned.

■ It is our conclusion that although the vine burner was not bailed for hire by defendants nor did the burner meet the usual definition of a package, nevertheless, the sale of the propane gas cannot logically be separated from the loan of the vine burner in which the gas was to be used. The two analogies are appropriate and their combination is the basis for this decision. We do not have to decide in this case whether one or the other by itself would be sufficient to justify the result. In a field of evolving law, it is sometimes wise to move no faster than is necessary to dispose of the immediate question.[①]

---

[①] "Sufficient unto the day *is* the evil thereof." Matthew 6:34.

The policy reasons given for the products liability cause of action, which are compensation (ability to spread the risk), satisfaction of the reasonable expectations of the purchaser or user (implied representational aspect), and over-all risk reduction (the impetus to manufacture a better product), are all as equally present in this transaction as if the vine burner itself were being sold.[2] If a product is sold and it is to be used by the purchaser in a particular device furnished by the seller, the device. itself has been placed in the stream of commerce as effectively as has the product and the two are theoretically inseparable. We therefore find that the trial court erred in granting a nonsuit on the products liability count.

The case is reversed and remanded for a new trial on both the negligence and the products liability counts.

TONGUE, J., concurring.

I concur in the result, but not in the reasoning of the majority. In my opinion, the allegations of the complaint, as well as the evidence, were sufficient to entitle plaintiff to have his case submitted to the jury on the theory that the condition of this equipment was so unsafe as to result in an ultrahazardous condition or nuisance and thus to bring this case within the rule of *Wights v. Staff Jennings,* 241 Or 301, 310-11, 405 P2d 624 (1965), regardless of whether or not this case is subject to the rule as stated in § 402A of the Restatement of Torts 2d.

[2] Each of these three policy bases is essential to the imposition of strict products liability. Moreover, it must be remembered that these policies are operative only where the challenged product is placed in the stream of commerce in the usual course of a defendant's business.