Argued November 1, 1978, affirmed June 26, 1979

# TILLMAN, *Appellant,*
### *v.*
# VANCE EQUIPMENT COMPANY, *Respondent.*
## (No. 415-523, SC 25158)

596 P2d 1299

Howard R. Hedrick, Portland, argued the cause and filed the briefs for appellant.

Elizabeth K. Reeve, Portland, argued the cause for respondent. On the brief were Ridgway K. Foley, Jr., and James F. Spiekerman, of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland.

Before Denecke, Chief Justice, and Holman, Howell, Bryson,* Lent** and Linde, Justices.

DENECKE, C. J.

---

*Bryson, J., retired April 1, 1979.

**Lent, J., did not participate in the decision in this matter.

**DENECKE, C. J.**

Plaintiff brought this action based upon the theory of strict liability in tort to recover for personal injuries caused by a 24-year-old crane sold by defendant, a used equipment dealer, to plaintiff's employer, Durametal. The court tried the case without a jury and found for the defendant. The plaintiff appeals and we affirm.

Durametal asked the defendant to locate a crane for purchase by Durametal. Defendant found one that looked suitable; Durametal inspected and approved it. The defendant purchased the crane and immediately resold it to Durametal. Defendant prepared documents making the sale "as is."

Durametal assigned plaintiff to operate the crane, including greasing it. Plaintiff believed the greasing of the gears could not be done properly without removing the gear cover and applying the grease while the gears were moving. While he was so greasing the gears, plaintiff's hand was drawn into them and he was injured.[1]

Plaintiff alleged the defendant seller was liable because the crane was defectively designed in that it could not be properly greased without removing the protective gear covering and for failing to provide warnings of the danger. The trial court found for the defendant because the crane was a used piece of equipment and sold "as is."

---

[1] Plaintiff was injured in March of 1975. Defendant has raised no issue concerning the applicability of ORS 30.905, which provides:

"(1) Notwithstanding ORS 12.115 or 12.140 and except as provided in subsection (2) of this section, a product liability civil action shall be commenced not later than eight years after the date on which the product was first purchased for use or consumption.

"(2) A product liability civil action shall be commenced not later than two years after the date on which the death, injury or damage complained of occurs."

The statute applies "only to causes of action, claims, rights or liabilities accruing after December 31, 1977." 1977 Oregon Laws ch 843, § 5.

The parties disagree about the effect of the "as is" disclaimer in the documents of sale. The issues raised include whether that disclaimer has any effect in an action of strict liability in tort,[2] and whether, if so, it is effective to disclaim liability for a design defect as distinguished from a defect in the condition of the individual product. We do not answer these questions because we conclude that the trial court was correct in holding that a seller of used goods is not strictly liable in tort for a defect in a used crane when that defect was created by the manufacturer.

While we have decided cases in which the sale of a used product was involved, we have not decided the issue presented in this case.[3]

In *Tucker v. Unit Crane & Shovel Corp.*, 256 Or 318, 473 P2d 862 (1970), we held the manufacturer liable for a death caused by a defect created at manufacture in a nine-year-old crane which had been purchased used by one Eldridge and then leased to the decedent's employer. The case is not a precedent for this case because it was brought against the manufacturer, who the trier of fact found had created the defect at the time of manufacture.

In *Markle v. Mulholland's, Inc.*, 265 Or 259, 509 P2d 529 (1973), the plaintiff was injured by the blowout of a recapped tire sold to plaintiff by the defendant retailer. The defect was in the casing, which is the used portion of a recapped tire. The sale of a recapped tire therefore is partially the sale of used goods.

---

[2] *See K Lines v. Roberts Motor Co.*, 273 Or 242, 541 P2d 1378 (1975). ORS 72.3160(3) (a portion of the Sales chapter of the Uniform Commercial Code) provides:

"Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; * * *."

[3] The few cases from other jurisdictions are collected at 53 ALR3d 337 (1973).

However, the majority of the court in *Markle* was of the opinion that the sale was not an ordinary sale of used goods.

> "* * * Nevertheless, the manufacturer selected this casing from among all available casings to retread and this implies something concerning its condition. Tread was put upon it which was capable of lasting more than 5,000 or 6,000 miles. This indicates that there is reason to believe that the manufacturer intended and the purchaser had a right to expect a quality of performance from the casing greater than that which it gave. * * *" *Id.* at 271.

In *Cornelius v. Bay Motors,* 258 Or 564, 484 P2d 299 (1971), the plaintiff was struck by an automobile sold as a used car by defendant and which had defective brakes. We expressly reserved ruling upon the potential strict liability in tort of a dealer in used vehicles and upheld a jury verdict for the defendant dealer.

In order to determine whether the defendant seller may be held liable we are required to re-examine why we arrived at the decision that a seller "who is free from fault in the usual sense" should be held strictly liable for a defective product. *Wights v. Staff Jennings,* 241 Or 301, 306, 405 P2d 624 (1965).

> "* * * Usually liability has been predicated on a breach of an implied warranty without explaining why the warranty was judicially implied. When the action was brought by the buyer against his immediate seller, it seemed enough that the plaintiff and defendant were parties to a contract, the warranty being born in some mysterious way out of the contractual relationship even in the absence of any promise express or implied in fact made by the seller. * * *." *Wights v. Staff Jennings, supra,* at 306.

Because of the impediments accompanying a contractual remedy, including the requirement of privity, we evolved the tort of strict liability. *Redfield v. Mead, Johnson & Co.,* 266 Or 273, 285, 512 P2d 776 (1973) (specially concurring). Strict liability could be imposed upon a party with whom the plaintiff was not in

privity. For this reason the manufacturer who created the defect could be sued directly. The injured party could usually obtain personal jurisdiction over the manufacturer by the use of the long-arm statutes. Because of the circumstances, there was no longer any urgent necessity to continue a cause of action against the seller who had not created the defect.

Nevertheless, courts did impose strict liability on the nonmanufacturer sellers of new goods as summarized in a recent study:

> "Over time most courts extended the rationale of these cases to both retailers and distributors. * * * Courts extended strict liability to retailers and distributors, in part, on the assumption that these groups would place pressure on the manufacturer to produce safe products. Courts also believed that retailers and distributors might be more accessible to suit than manufacturers." U.S. Dept of Commerce, *Interagency Task Force on Product Liability: Final Report* II-4, 5 (1976).

As Mr. Justice Traynor said in *Vandermark v. Ford Motor Company,* 61 Cal 2d 256, 37 Cal Rptr 896, 391 P2d 168, 171 (1964):

> "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. *(See Greenman v. Yuba Power Products, Inc.,* 59 Cal 2d 57, 63, 27 Cal. Rptr. 697, 377 P2d 897). In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. * * *."

Mr. Justice Schaefer stated in *Dunham v. Vaughan & Bushnell Mfg. Co.,* 42 Ill2d 339, 247 NE2d 401, 404 (1969): "The strict liability of a retailer arises from his integral role in the overall producing and marketing

enterprise and affords an additional incentive to safety."

Moreover, if a jurisdiction has adopted the principle of strict liability on the basis of enterprise liability, the liability of the seller of either a new or used product would logically follow. A judge of the Superior Court of New Jersey in a case involving a used truck explained the reasoning:

> "We will first consider whether this is the type of case for the application of strict liability in tort. An economic analysis of enterprise liability which includes direct as well as indirect costs, would charge those in the business of selling a defective product with responsibility for all harms, physical and economic, which result from its use. Baxter, 'The SST: From Watts to Harlem in Two Hours,' 21 Stanf. L. Rev. 1 (1968); Coase, 'The Problem of Social Cost,' 3 J. Law & Econ. 1 (1960). To a considerable extent—with respect to *new* goods—the manufacturer bases the cost of his product on his expenses, which include damages caused by the product and insurance to cover those damages. This cost is spread among all the customers for that product; it reflects the justifiable expectations of customers regarding safety, quality and durability of new goods. Sellers of used goods may similarly distribute their costs of doing business which, in turn, will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods."
> *Turner v. International Harvester Company,* 133 NJ Super 277, 336 A2d 62, 69 (1975).

To the same effect, *Hovenden v. Tenbush,* 529 SW2d 302 (Tex Civ App 1975) (sale of used brick), noted in 8 St. Mary's L J 196 (1976).

■  This court has never been willing to rely on enterprise liability alone as a justification for strict liability for defective products. *See Markle v. Mulholland's, Inc., supra* (265 Or at 265). Instead, we have identified three justifications for the doctrine:

> "* * * [C]ompensation (ability to spread the risk), satisfaction of the reasonable expectations of the

purchaser or user (implied representational aspect), and over-all risk reduction (the impetus to manufacture a better product) * * *." *Fulbright v. Klamath Gas Co.,* 271 Or 449, 460, 533 P2d 316 (1975).

While dealers in used goods are, as a class, capable like other businesses of providing for the compensation of injured parties and the allocation of the cost of injuries caused by the products they sell, we are not convinced that the other two considerations identified in *Fulbright* weigh sufficiently in this class of cases to justify imposing strict liability on sellers of used goods generally.[4]

Our opinions have discussed, on other occasions, what we called in *Fulbright* the "implied representational aspect" of the justification for strict products liability. In *Heaton v. Ford Motor Co.,* 248 Or 467, 435 P2d 806 (1967), both the majority and the dissent indicated that at least in some cases it was for the jury to decide what degree of safety the average consumer of a product expects. However, in *Markle v. Mulholland's, Inc., supra* (265 Or 259), a majority of the court agreed that the question was not solely a factual one. The plurality opinion says:

"* * * It is an expectation which is the result of the manufacturer's or seller's placing the article in the stream of commerce with the intention that it be purchased. This expectation is given legal sanction by the law through an assumption that the seller, by so placing the article in the stream of commerce, has represented that the article is not unreasonably dangerous if put to its intended use." 265 Or at 268.

This representational aspect, the opinion continues,

"* * * * is one of limitation in an attempt to keep [the expansion of strict liability doctrine] within

---

[4] When considering the applicability of these policy bases, of course, the courts consider their application not to the specific facts of the particular case, but rather to the general type of situation before them. That means, for example, that they are not concerned with a particular seller's actual insurance coverage, but with the ability in general of those in the business of selling a product to spread the risk through such means as pricing and insurance.

manageable and logical bounds and to keep the liability from being absolute." *Id.*

By identifying this purpose of limitation we recognized that the court's role in defining the kinds of cases in which the law will permit a jury to find an expectation of safety serves a policy function. *See, also, id.* at 293-294 (Denecke, J., dissenting) and *Cornelius v. Bay Motors, supra* (258 Or at 581-582) (O'Connell, C. J., concurring).

We consider, then, whether the trier of fact may infer any representation as to safety from the sale of a used product.

■ We conclude that holding every dealer in used goods responsible regardless of fault for injuries caused by defects in his goods would not only affect the prices of used goods; it would work a significant change in the very nature of used goods markets. Those markets, generally speaking, operate on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion). The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.[5]

We are of the opinion that the sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have

---

[5] While the buyer's actual expectations in a particular transaction have no logical relevance to whether an injured plaintiff who was not the purchaser should be allowed to recover in a given case, the expectations of purchasers generally are relevant to what the public expects, and the courts should recognize, as the appropriate level of the seller's responsibility for the safe condition of the goods he sells.

held are justifiably created by the introduction of a new product into the stream of commerce.

■ As to the risk-reduction aspect of strict products liability, the position of the used-goods dealer is normally entirely outside the original chain of distribution of the product. As a consequence, we conclude, any risk reduction which would be accomplished by imposing strict liability on the dealer in used goods would not be significant enough to justify our taking that step. The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about possible dangerous defects in particular product lines or about actual and potential liability claims.

In theory, a dealer in used goods who is held liable for injuries caused by a design defect or manufacturing flaw could obtain indemnity from the manufacturer. This possibility supports the argument that permitting strict liability claims against dealers in used goods will add to the financial incentive for manufacturers to design and build safe products. We believe, however, that the influence of this possibility as a practical factor in risk prevention is considerably diluted where used goods are involved due to such problems as statutes of limitation and the increasing difficulty as time passes of locating a still existing and solvent manufacturer.

■ Both of these considerations, of course, are also obstacles to injured parties attempting to recover directly from the manufacturer. However, although the provision of an adequate remedy for persons injured by defective products has been the major impetus to the development of strict product liability, it cannot provide the sole justification for imposing liability without fault on a particular class of defendants.

[756]

■ For the reasons we have discussed, we have concluded that the relevant policy considerations do not justify imposing strict liability for defective products on dealers in used goods, at least in the absence of some representation of quality beyond the sale itself or of a special position vis-a-vis the original manufacturer or others in the chain of original distribution. Accord: *Rix v. Reeves*, 23 Ariz App 243, 532 P2d 185 (1975).

■ We have suggested, although we have never had occasion to rule on the question, that those who are in the business of leasing products to others may be strictly liable for injuries caused by defective products on the same basis as sellers of new products. *Fulbright v. Klamath Gas Co., supra* (271 Or at 455-458, 459). It has been urged that recognizing such a liability on the part of lessors while refusing to hold sellers of used goods liable would be logically inconsistent, because most leased goods are used when they reach the lessee. *Hovenden v. Tenbush, supra* (529 SW2d at 310). We see no such inconsistency when the focus of analysis is not on the status of the product but on that of the potential defendant. The lessor chooses the products which he offers in a significantly different way than does the typical dealer in used goods; the fact that he offers them repeatedly to different users as products he has selected may constitute a representation as to their quality; and it may well be that he has purchased them, either new or used, from a dealer who is directly related to the original distribution chain. Our rationale in the present case leaves the question of a lessor's strict liability an open one in this jurisdiction.

■ Plaintiff contends the trial court also erred in refusing to admit into evidence defendant's third party complaint which was offered to show a judicial admission that the crane was defective. In view of our decision that the defendant seller is not liable in strict

[757]

liability in tort for the sale of a defective crane, the admission, if it was an admission, is irrelevant.

Affirmed.