James O. GRIMES, Mark Alan Grimes, and Brandt, Inc., a Wisconsin Corporation, Plaintiffs,

v.

AXTELL FORD LINCOLN–MERCURY, a Corporation, Defendant-Movant.

AXTELL FORD LINCOLN–MERCURY, a Corporation, Plaintiff-Movant,

v.

GRALNEK–DUNITZ COMPANY, Defendant.

No. 86–994.

Supreme Court of Iowa.

April 15, 1987.

Thomas J. Walsh Sr. and Thomas J. Walsh Jr. of Walsh, Fullenkamp, Doyle & Rau, Omaha, Neb., and Troyce Wheeler of Anderson & Wheeler, Council Bluffs, for Grimes and Brandt.

John D. Sens and William R. Hughes Jr. of Stuart, Tinley, Peters, Thorn, Smits & Sens, Council Bluffs, for Axtell Ford.

Dean F. Suing of Katskee & Henatsch, Omaha, Neb., and David F. McCann of Dipple & McCann, Council Bluffs, for Gralnek-Dunitz.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, WOLLE, and LAVORATO, JJ.

LAVORATO, Justice.

The United States Court of Appeals for the Eighth Circuit has certified three questions of law to us. *See* Iowa Code ch. 684A; Iowa R.App.P. 451–61. The issue is whether we will extend the doctrine of strict liability to sellers of used goods.

The plaintiffs were injured as a result of the failure of a used axle shaft installed on their vehicle. The defect in the shaft was not a manufacturing or design defect, nor was it created by either the defendant (installer) or the third-party defendant (salvage yard). Instead, the defect was caused by an unknown person while the axle shaft was in the possession of an unknown previous owner.

The federal court stated the relevant facts as follows:

The left rear axle shaft on James Grimes' 1979 Ford Econoline van failed on June 25, 1981, while Mark Grimes was driving the van on a highway near Smithland, Iowa. This failure caused the left rear wheel to come off and Mark lost control of the vehicle. The van went off the highway and overturned.

James was a passenger in the van at the time of the accident. Both he and Mark are Nebraska residents, and both suffered personal injuries in the accident. They brought this suit against Axtell Ford Lincoln-Mercury (Axtell), a Newton, Iowa, Ford dealership which had installed a used rear axle assembly in Grimes' van shortly after the original axle failed on December 8, 1980. Axtell responded to the suit by filing a third-party complaint against Gralnek-Dunitz Company, a Newton, Iowa, salvage dealer which sold Axtell the used axle assembly on December 9, 1980.

A Wisconsin corporation, Brandt, Inc., joined the suit as a plaintiff. At the time of the accident, Grimes was transporting Brandt's money handling machines in the back of the van. These machines were damaged when the van overturned.

Unrefuted evidence presented at trial disclosed that the axle shaft had failed because it had been exposed to heat which had weakened it and that the exposure to heat had occurred before the axle came into the possession of Gralnek-Dunitz Company. The defect in the shaft was latent and could only be discovered by a skilled metallurgist. Gralnek-Dunitz had not disassembled or inspected the axle prior to selling it to Axtell. Prior to installing the axle in Grimes' van, Axtell's mechanic noticed grease leaking from the assembly and replaced the axle's grease seal. Axtell's mechanic had also replaced the pinion yoke on the axle assembly in order to adapt the assembly to Grimes' van.

The plaintiffs' case against Axtell was submitted to the jury on a strict liability theory. [The jury found for the plaintiffs and awarded them damages.]

Axtell's case against Gralnek-Dunitz for indemnity or contribution was submitted to the jury on express warranty and strict liability theories. The jury found for Gralnek-Dunitz on Axtell's express warranty theory. With respect to the strict liability theory, the jury answered "yes" to the following special interrogatories:

Special Interrogatory No. 6: Based on the evidence you have heard, do you find that the "rear axle assembly" was defective at the time it was sold by Gralnek-Dunitz to Axtell Ford on December 9, 1980?

Special Interrogatory No. 7: Did the axle assembly sold by Gralnek-Dunitz to Axtell reach the Plaintiff Grimes in a condition substantially unchanged from its condition when it was sold by Gralnek-Dunitz?

The jury answered "no," however, to the following special interrogatory:

Special Interrogatory No. 8: Did Axtell Ford have a right to expect that the rear-end assembly sold to it by Gralnek-Dunitz was free of defects when it was delivered to Axtell by Gralnek-Dunitz?

Based upon this last answer the trial court (Hon. Donald E. O'Brien) entered judgment for Gralnek-Dunitz on Axtell's strict liability theory. [Thus, the court found for Gralnek-Dunitz on Axtell's claim for indemnity or contribution.]

Axtell then appealed to [the United States Court of Appeals for the Eighth Circuit], contending that the doctrine of strict liability should not be applied to a seller of used goods. Alternatively, Axtell maintained that if the doctrine is applied to it, then the doctrine should also be applied to Gralnek-Dunitz.

The federal court posed certified questions as follows:

1. Can the doctrine of strict liability in tort be applied to sellers of used goods? If not, question numbers two and three need not be answered.

2. Can an automobile repair garage and Ford dealership which purchased [a used axle having an unknown defect] from a salvage yard and installed it in a Ford van after replacing the axle's grease seal and pinion yoke, be properly held liable under the doctrine of strict liability in tort? If not, question number three need not be answered.

3. Can an automobile salvage yard which did not inspect or alter the used axle which had a latent defect be proper-

ly held liable under the doctrine of strict liability in tort where the used axle was defective when it came into the salvage yard's possession, was defective when it was sold to a repair garage, and a jury has determined that the repair garage had no right to expect that the axle be free of defects?

I. We decline to answer question one under the facts presented. We begin with the federal court's question number two, which we answer negatively. Thus, question three requires no answer. In addressing the question, we restrict our answer to the facts provided with the certified questions. *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 70 (Iowa 1986). We do not foreclose the possibility of our applying the doctrine of strict liability to sellers of used goods under other circumstances.

We first examine the policy reasons behind the doctrine of strict liability. We adopted strict liability in tort, as set out at Restatement (Second) of Torts section 402A, in *Hawkeye-Security Ins. Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970) (suit against manufacturer of defective brakes).[1] We gave the following reasons for adopting the doctrine:

> The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.
>
> . . . .
>
> [P]ublic interest in human life and health, the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present and ... compelling....
>
> . . . .

Existence of the defect means violation of the representation implicit in the presence of the article in the stream of trade that it is suitable for the general purposes for which it is sold and for which such goods are generally appropriate.

174 N.W.2d at 683–84 (citations omitted). Our goal in imposing strict liability is twofold. First, we hope to deter the sale of defective goods by holding those who control the manufacturing process strictly liable. Consequently, we have applied strict liability to retailers as well as to manufacturers. *Osborn v. Massey-Ferguson, Inc.*, 290 N.W.2d 893, 901 (Iowa 1980). *But see* 1986 Iowa Acts ch. 1211, § 32 (codified at Iowa Code § 613.18 (1987)) (limits scope of strict liability as to nonmanufacturers, including retailers, under certain circumstances). Retailers are in a position to inspect and repair their products or to exert pressure on manufacturers to improve product safety. *See* Note, *Protecting the Buyer of Used Products: Is Strict Liability for Commercial Sellers Desirable?*, 33 Stan.L.Rev. 535, 539–42 (1981). Second, we intend to provide compensation to those injured by defective goods. For example, we made the strict liability doctrine available to injured bystanders in addition to consumers and users of defective goods. *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 16 (Iowa 1977).

II. Several courts have addressed the general question whether and in what circumstances a dealer in used products should be held strictly liable. *See generally* Annotation, *Strict Liability in Tort: Liability of Seller of Used Product*, 53 A.L.R.3d 337 (1973). Their answers are as varied as the many different fact situations that engender the issue, resulting in a split of authority.

---

1. Restatement (Second) of Torts § 402A (1965) provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

  (a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

  (a) the seller has exercised all possible care in the preparation and sale of his product, and

  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Some courts imposing strict liability on sellers of used products have done so because they conclude Restatement section 402A is not limited by its terms to sellers of new products. *See, e.g., Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.*, 135 Ariz. 309, 660 P.2d 1236, 1237 (Ct.App.1983); *Hovenden v. Tenbush*, 529 S.W.2d 302, 306 (Tex.Ct.App.1975). Those courts found that the same policy reasons for holding sellers of new goods strictly liable under section 402A apply to dealers in used goods. *See Jordan*, 660 P.2d at 1242; *Turner v. International Harvester Co.*, 133 N.J.Super. 277, 336 A.2d 62, 71 (Law Div.1975); *Hovenden*, 529 S.W.2d at 310.

In contrast, those courts that have declined to extend the doctrine of strict liability to sellers of used products have found that the policy reasons for holding sellers of new goods strictly liable are not fully applicable to sellers of used products. *See, e.g., Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785, 786–87 (1975); *Tillman v. Vance Equip. Co.*, 286 Or. 747, 596 P.2d 1299, 1304 (1979); *Crandell v. Larkin & Jones Appliance Co.*, 334 N.W.2d 31, 34 (S.D.1983) (adopting *Tillman* reasoning). Those courts conclude that section 402A does not apply.

In *Tillman v. Vance Equip. Co.*, 286 Or. 747, 596 P.2d 1299, 1304 (1979), the Oregon Supreme Court held that strict liability would not apply to the seller of a used crane having a manufacturer's design defect. The court reviewed its three policy reasons for strict liability: (1) reasonable expectations of consumer or user, (2) impetus to manufacture a better product, and (3) compensation. *Id.* at 1303. The court decided that the first two policy reasons would not be advanced by imposing strict liability on dealers in used goods. Buyers of used goods who do not bargain for specific assurances of quality have lesser expectations of safety than buyers of new products. *See id.* at 1303–04. Because the dealer in used goods is normally entirely outside the original chain of distribution, the incentive to reduce risk accomplished by imposing strict liability would be insig-

nificant. *Id.* at 1304. Regarding compensation, the court stated that

> although the provision of an adequate remedy for persons injured by defective products has been the major impetus to the development of strict product liability, it cannot provide the sole justification for imposing liability without fault on a particular class of defendants.

596 P.2d at 1304. The court concluded that the policy reasons do not justify imposing strict liability for defective products on dealers in used goods. *Id.*

In *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785 (1975), the Illinois Supreme Court faced a fact situation involving defective brakes on a used car. As in this case, the defect was caused by an unknown third party while the automobile was in the possession of an unknown previous owner. *Id.* at 787. Despite allegations that the defect would have been discovered upon reasonable inspection, *id.* at 788 (Goldenhersh, J., dissenting), the majority declined to impose strict liability. The court reasoned that

> [i]f strict liability is imposed upon the facts alleged here, the used car dealer would in effect become an insurer against defects which had come into existence after the chain of distribution was completed, and while the product was under the control of one or more consumers.

329 N.E.2d at 787. *Accord Masker v. Smith*, 405 So.2d 432, 434 (Fla.Dist.Ct.App. 1981). Thus, the Illinois Supreme Court would apply strict liability to dealers in used goods only in the case of design or manufacturing defects or where the dealer itself created the defect. *See Peterson*, 329 N.E.2d at 787.

More recently the South Dakota Supreme Court addressed the issue in the context of the sale of a defective used clothes dryer described by the seller as a "Quality Reconditioned Unit" which was "Guaranteed." *Crandell v. Larkin & Jones Appliance Co.*, 334 N.W.2d 31, 32 (S.D.1983). The court agreed with the rule stated by the Oregon Supreme Court in *Tillman* to the extent it applies to the broad commercial

used-goods market. *Id.* at 34. The South Dakota court recognized the exception, however, that dealers who rebuild or recondition goods are subject to strict liability, regardless of fault, because of heightened consumer expectations. *Id.*

■ III. The specific issue presented to us by question two is whether the seller of a defective used good can be held strictly liable where the defect is (1) not a manufacturing or design defect, (2) not caused by the dealer, and (3) not discoverable by reasonable and customary inspection. The used good in the fact pattern presented was not a rebuilt, reconditioned, or recapped product. We reject the plaintiffs' theory that Axtell's replacing the grease seal and pinion yoke before installing the assembly constitutes rebuilding or reconditioning the used rear axle. Under these facts, we decline to apply the doctrine of strict liability.

The federal district court allowed the strict liability claim against Axtell because "product representations made in general by car dealerships ... would heighten consumer expectations to a level that would justify an implied representation of safety," and because Axtell "had a continuing business relationship with the manufacturer of the product, Ford Motor Company." We do not agree that car dealerships that sell used parts make a more particular representation of quality than any other dealer in used goods.

> [T]he sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce.

*Tillman*, 596 P.2d at 1304.

> If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it (by, for example, providing a guarantee, limiting his stock of goods to those of a particular quality, advertising that his used goods are specially selected, or in some other fashion).

*Id.* at 1303. We also do not agree that Axtell, as a dealer in used goods, is in any special position vis-a-vis the original manufacturer, Ford Motor Company. *Id.* at 1304. This is not a case involving a manufacturing or design defect. Nor did Ford Motor Company supply the used axle to Axtell.

We agree with the Illinois and Oregon courts that our goal to deter the sale of defective goods would not be significantly furthered by applying strict liability to dealers in used goods under the facts given. *See Peterson*, 329 N.E.2d at 786–87; *Tillman*, 596 P.2d at 1304. We also concur with the statement in *Tillman* that the compensation goal cannot be the sole justification for imposing strict liability. *Tillman*, 596 P.2d at 1304.

■ IV. We will not extend the doctrine of strict liability to a dealer in used goods for latent defects, not arising from design or manufacture, which were caused while the goods were in the possession of a previous owner. We therefore answer certified question number two in the negative. We decline to answer certified question number one under the facts presented. Certified question number three requires no answer.

CERTIFIED QUESTIONS ANSWERED.