Jose Jorge CRUZ, Plaintiff,

v.

MIDLAND–ROSS CORPORATION,
et al., Defendants.

No. 92 C 5227.

United States District Court,
N.D. Illinois, E.D.

Feb. 3, 1993.

Paul I. Nemoy, Philip E. Howard, Ltd., Chicago, IL, for Jose Jorge Cruz.

Timothy D. McMahon, Wiedner & McAuliffe, Ltd., Chicago, IL, for Midland–Ross Corporation.

Roderick Alan Palmore, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Consol. Equipment Co.

Timothy D. McMahon, Wiedner & McAuliffe, Ltd., Edward J. Szewczyk, Jobin & Flynn, Chicago, IL, for General Surface Hardening Inc.

## MEMORANDUM OPINION

GRADY, District Judge.

This case comes before the court on defendant Consolidated Equipment Company's motion for summary judgment. For the reasons given below, defendant's motion is granted.

FACTS

On July 12, 1990, Jose Cruz, an employee of General Surface Hardening ("GSH"), was injured at work when the door of an

industrial furnace fell on his arm as he attempted to extract metal pieces from a tray inside the furnace. The accident resulted in a complete amputation of plaintiff's right arm.

The furnace involved was a used Forc–Aire combustion model manufactured by defendant Midland–Ross Corporation ("MRC") in 1969 and sold to Besser Company of Roanoke, Illinois, that same year. Besser owned and operated the furnace until September 16, 1986, when it sold the furnace by public auction to defendant Consolidated Equipment Company ("Consolidated").

Consolidated is a Michigan-based "father and son operation," engaged in the business of buying and selling pieces of used industrial equipment. Defendant's Motion for Summary Judgment, Exhibit 1 at 155. The company operates as a used equipment broker, which means that it only purchases items with the intent of quickly reselling them to end-users. In the instant case, George Howell, Sr., president of Consolidated, knew that GSH was interested in buying a used combustion furnace. Based on that knowledge, Mr. Howell dispatched his son, George Howell, Jr., to Roanoke, Illinois, to participate in the Besser auction. On behalf of Consolidated, George Howell, Jr. purchased the furnace with a bid of $26,120.00. The transaction was consummated by wire transfer of funds on September 17, 1986.

Though Mr. Howell did view the furnace prior to making his winning bid, at no time, either before or after the auction, did he, or any other person acting on behalf of Consolidated, inspect, examine or test the physical condition of the furnace. Nor did Consolidated ever assume physical possession of the furnace. As is typical practice among used equipment brokers, the defendant simply purchased the equipment "AS IS," and left it in place until a buyer could be located. Defendant's Motion for Summary Judgment, Exhibit 1 at 155. Thus, the furnace remained at Besser's premises in Roanoke.

On September 19, 1986, Consolidated informed GSH by phone that the Forc–Aire furnace was available for purchase. Shortly thereafter, the vice-president of GSH travelled to Roanoke, inspected the furnace and decided to purchase it. No one from Consolidated accompanied the vice-president during his visit, nor were any representations or warranties made by Consolidated regarding the condition of the furnace. On September 25, 1986, GSH purchased the furnace from Consolidated for $64,000.00 on an "AS IS, WHERE IS" basis. Shortly thereafter, GSH employees transported the furnace from Roanoke to GSH's facilities in Chicago, where the furnace was installed for use in the company's plant.

Plaintiff alleges that the furnace was sold to GSH in a defective condition and that Consolidated negligently failed to test, inspect, refurbish, repair, and warn of dangers with respect to the furnace.[1] Consolidated now moves for summary judgment, arguing that under Illinois law it was under no duty to inspect, test or provide warnings regarding the use of the furnace.

*DISCUSSION*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106

---

1. Plaintiff has not sued in strict products liability because the Illinois statute of repose, Ill.Rev. Stat. ch. 110, ¶ 13–213 provides that:

    [N]o product liability action based on the doctrine of strict liability in tort shall be commenced except within the applicable limitations period and, in any event, within 12 years from the date of first sale, lease or delivery of possession by a seller or 10 years from the date of first sale, lease or delivery of posses-

    sion to its initial user, consumer, or other non-seller, which ever period expires earlier....

    The furnace which is the subject of plaintiff's complaint was manufactured and delivered to the initial purchaser more than twenty years prior to the time that plaintiff filed his complaint. Thus, all strict liability claims relating to the sale of the furnace are time-barred.

S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A "genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Dribeck Importers, Inc. v. G. Heileman Brewing Co.*, 883 F.2d 569, 573 (7th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. City of Chicago*, 789 F.2d 534, 536 (7th Cir.1986). Once the moving party has supported its motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings." Fed. R.Civ.P. 56(e). The adverse party's response, by way of deposition, affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. *Id.*

Under Illinois law, all persons who place defective products into the "stream of commerce," including suppliers, distributors, wholesalers and retailers, "may be held liable to an injured user." *Hammond v. North American Asbestos Corp.*, 97 Ill.2d 195, 73 Ill.Dec. 350, 356–57, 454 N.E.2d 210, 216–17 (1983). This does not mean, however, that Illinois law blindly imposes product liability on all re-sellers, no matter how remotely connected to the "stream of commerce." Rather, in order to be liable to an injured user, the re-seller of a defective product must be deemed to fall within "the original producing and marketing chain." *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785, 786 (1975); *Skarski v. Ace–Chicago Great Dane Corp.*, 138 Ill.App.3d 301, 93 Ill.Dec. 102, 106, 485 N.E.2d 1312, 1316 (1985) ("There are many parties who conceivably have some relation with the manufacture and sale of the product, but their relationship is peripheral and not directly related to the distributive process."); *see also Mechanical Rubber v. Caterpillar Tractor*, 80 Ill.App.3d 262, 35 Ill.Dec. 656, 657–58, 399 N.E.2d 722, 723–24 (1980) (a party may be involved with the sale of a product but

still be outside the distributing system contemplated by products liability theories).

Judicial determination of whether a party falls within "the original producing and marketing chain" ultimately turns on public policy concerns. The policy behind imposing liability on suppliers, distributors, wholesalers and retailers "is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product." *Peterson v. Lou Bachrodt Chevrolet Co.*, 61 Ill.2d 17, 329 N.E.2d 785, 787 (1975); *see also Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401, 404 (1969) ("The strict liability of a retailer arises from his integral role in the overall producing and marketing enterprise and affords an additional incentive to safety.").

In *Peterson*, the Illinois Supreme Court declined to apply the principle of strict products liability to a used car dealer which sold a vehicle in an allegedly defective condition because, in the court's view, used car dealers are not in a position to pressure manufacturers into building safer products. *Peterson*, 329 N.E.2d at 786–87. Thus, imposition of strict liability upon used car dealers would unfairly require them "to become an insurer against defects which had come into existence after the chain of distribution was completed, and while the product was under the control of one or more consumers." *Id.*, 329 N.E.2d at 787.

Though the rule in *Peterson* dealt with strict liability in tort, it has since been expanded to include products liability claims sounding in negligence. *Rahn v. Gerdts*, 119 Ill.App.3d 781, 74 Ill.Dec. 378, 455 N.E.2d 807 (1983). In *Rahn*, the Gerdts were engaged in the business of leasing motor homes. Defendant Deluxe Motor Home Sales sold a used motor home to the Gerdts, which the Gerdts in turn leased to the plaintiff. Subsequently, a fire occurred in the motor home, causing personal injury to plaintiff. Plaintiff sought damages from Deluxe for negligent inspection and negligent failure to inspect. The court invoked *Peterson* to hold that

the seller of a used motor vehicle is sufficiently outside the production and marketing chain "to negate any duty to generally inspect or discover defects." *Rahn*, 74 Ill. Dec. at 382, 455 N.E.2d at 811.

■ *Peterson* and *Rahn* make clear that under either theory of liability (strict tort or negligence), a seller of products must occupy a position within the "original producing or marketing chain" in order to be liable for injuries caused by those products. Moreover, *Rahn* and *Peterson* together indicate that, under Illinois law, sellers of used equipment do not fall within the "original producing or marketing chain" and therefore are not typically liable under traditional products liability theories.

■ Other jurisdictions share the view of the Illinois courts on this issue. In *Tillman v. Vance Equipment Co.*, 286 Or. 747, 596 P.2d 1299 (1979), the Oregon Supreme Court held that a used-equipment dealer who sold a crane in a defective condition could not be held strictly liable for injuries caused by the defective equipment. As in *Peterson*, the *Tillman* court acknowledged that the policy behind imposing strict tort liability on retailers and distributors was predicated "on the assumption that these groups would place pressure on the manufacturer to produce safe products." *Id.*, 596 P.2d at 1302. And similar to *Peterson*, the *Tillman* court also found used-goods dealers to be "entirely outside the chain of distribution of the product." *Id.*, 596 P.2d at 1304. Thus, the court concluded, the underlying goal of encouraging manufacturers to produce safer goods would not be furthered by imposing strict products liability on used-goods dealers. *Id.; see also Sell v. Bertsch and Co., Inc.*, 577 F.Supp. 1393, 1399 (D.Kan.1984) (declining to hold used-product seller strictly liable because seller was "so far removed from the initial chain of distribution that it could not have discouraged the production and manufacture of a defective product.").

In the instant case, defendant Consolidated arguably was even more removed from the original chain than a typical used-goods dealer. Unlike most used-goods dealers, brokers like Consolidated do not take physical possession of the equipment which they buy and sell. Instead, purchased equipment is left in place until a buyer is quickly located. The equipment is usually re-sold on an "AS–IS, WHERE–IS" basis, leaving the buyer responsible for transportation, installation, and any necessary modifications or repairs.

Defendant Consolidated played only a passive role, acting as mere conduit for the transaction. Consolidated's brief involvement was limited to a wire transfer of funds, and holding paper title to the furnace for a total of nine days. Consolidated never inspected or took physical possession of the furnace.

The Seventh Circuit has held that sellers who play a mere financial role in connection with the sale of goods are not within the "original chain of distribution" for purposes of products liability. *Abco Metals Corp. v. Equico Lessors, Inc.*, 721 F.2d 583 (7th Cir.1983). In *Abco*, defendant Equico purchased a piece of industrial equipment solely for the purpose of leasing it to the plaintiff. At the time of the transaction, the parties agreed that plaintiff would buy the machine from defendant upon expiration of the lease period. When the machine turned out to be defective, plaintiff brought a strict products liability action against defendant. In affirming summary judgment for the defendant, the court held that, whether viewed as lessor or seller, Equico's financial role in the transaction was not enough to place it in the original chain of distribution:

> Under Illinois law, the label accorded the transaction is of little consequence for purposes of strict products liability; rather, an injured user of a defective product must plead and prove that the defendant was a part of the original chain of production, marketing, or distribution of the product. We conclude that the Illinois courts would find that Equico, which merely provided the financial means for the transaction, was not a part of that chain.

*Abco*, 721 F.2d at 586.

In addition to this prevailing case law, leading commentators on the subject of products liability agree that

[e]valuation of strict tort or negligence liability for the seller of used products ... will turn upon whether the seller is the simple conduit for the transaction, discharging only a passive role in the sale, or alternatively, has assumed a more intrusive and affirmative role by either warranting the condition of the product, or inspecting, reconditioning, or rebuilding the product.

1 M. Stuart Madden, *Products Liability* § 3.26 (2d ed. 1988); *see also* Marshall S. Shapo, *The Law of Products Liability* ¶ 12.14 (1987) (courts are properly reluctant to apply strict forms of liability to brokers and other middlemen who merely serve as a conduit to the transaction).

Sound market reasons dictate that a used-equipment broker acting as a mere conduit to a transaction should not be liable for unknown defects in equipment sold. Unlike the new products market, the market for used products

> operate[s] on the apparent understanding that the seller, even though he is in the business of selling such goods, makes no particular representation about their quality simply by offering them for sale. If a buyer wants some assurance of quality, he typically either bargains for it in the specific transaction or seeks out a dealer who routinely offers it.... The flexibility of this kind of market appears to serve legitimate interests of buyers as well as sellers.

*Tillman v. Vance Equipment Co.*, 286 Or. 747, 596 P.2d 1299, 1303 (1979).

Thus, "the sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce." *Tillman*, 596 P.2d at 1303; *La Rosa v. Superior Court*, 122 Cal.App.3d 741, 757, 176 Cal.Rptr. 224

(1981) (noting that consumers of used goods are primarily motivated by price, and that their expectations as to quality—including safety—are correspondingly reduced); 1 M. Stuart Madden, *Products Liability* § 3.26 (2d ed. 1988) ("[T]he prevailing custom in the used product market is that the seller does not offer, and the buyer does not expect, either express or implied representations of quality.").

Finally, from a cost/benefit standpoint, any rule requiring used equipment brokers to inspect and test equipment before selling it cannot be justified. Because (a) used goods brokers lack the ability to encourage the production of safer goods, and (b) the sale of used products does not generate the kind of expectations of safety associated with new products, the risk reduction associated with such a rule would be marginal at best. *Tillman*, 596 P.2d at 1303–04. Meanwhile, the costs of such a rule would be prohibitive. The vitality of the used goods market depends upon the ability of buyers and sellers to exchange used goods at low prices. See *La Rosa*, 122 Cal. App.3d at 757, 176 Cal.Rptr. 224. But a rule which would require brokers to inspect and test each piece of used equipment bought and sold, would necessarily impair their ability to maintain low prices. As the court in *La Rosa* noted, "[U]sed-goods dealer[s] would find it difficult or impossible to assimilate the cost of ad hoc inspection and repair into an attractive price...." *Id.* at 758, 176 Cal.Rptr. 224. Thus, the proportionate cost to used-goods dealers of routinely inspecting and testing used products "would tend simply to drive them out of business and to leave the market to the random seller." *Id.* at 757, 176 Cal.Rptr. 224. An entire market should not be sacrificed in order to obtain marginal gains in safety.[2]

---

**2.** Comment *d* to § 402 of the Restatement (Second) of Torts specifically addresses these cost/benefit considerations, and states:

> The slight risk inherent in the possibility that the chattel may be defective is not sufficient to constitute an unreasonable risk. The burden on the seller of requiring him to inspect chattels which he reasonably believes to be free from hidden danger outweighs the mag-

nitude of the risk that a particular chattel may be dangerously defective.

Section 402 itself, entitled 'Absence of Duty to Inspect Chattel,' lends overall support to defendant's claim that as a used goods broker it has no general duty to inspect or test the equipment which it sells:

> A seller of a chattel manufactured by a third person, who neither knows nor has reason to

## CONCLUSION

For the foregoing reasons, defendant Consolidated's motion for summary judgment is granted.

know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it.

Finally, Comment *c* to § 402 indicates that the term "reason to know," as used in this section of the Restatement, does not impose any affirmative duty on the seller to ascertain unknown facts.