[No. 2272-1. Division One. March 24, 1975.]

KEVIN MARTIN, *Plaintiff*, v. WILLIAM SCHOONOVER *et al*, *Appellants*, CLARK FEED & SEED, INC., *et al*, *Respondents*.

*Millhouse, Nelle & Packer* and *Mark B. Packer*, for appellants.

CALLOW, J.—This action was originally commenced by the guardian ad litem for Kevin Martin, a minor, against the defendants Schoonover for injuries the minor suffered when he was bitten by a St. Bernard dog owned by the Schoonovers. The Schoonovers in turn filed a third-party complaint against the third-party defendants Clark Feed & Seed, Inc., alleging that the company was negligent in selling a defective and inadequate dog chain to the Schoonovers when the company knew the chain was to be used to restrain a St. Bernard. The defendants Schoonover further allege that in selling the defective chain, the third-party defendant Clark Feed & Seed breached its implied warranty of fitness and, in any event, was strictly liable in tort for the damages which ensued when the chain broke. Clark

Feed & Seed generally denied the allegations of the third-party complaint and specifically denied any special knowledge of the characteristics of the dog and the purpose for which the chain was purchased. The feed company further pleaded contributory negligence on the part of the Schoonovers and denied any breach of warranty. The wholesaler and the manufacturer were not parties to the trial and are not before us on appeal.

The evidence showed William Schoonover, the defendant, was cleaning the kennel of his St. Bernard dog and had secured the dog around the neck by the choke chain which he had purchased from Clark Feed & Seed. The dog lurched against the chain, snapped it and then attacked the boy. An expert witness testified that the chain broke because of a defective weld. Mr. Schoonover testified he had purchased the chain a few months before the attack. He further testified that he had personally picked out the chain and then had been asked by a clerk what he was going to use it for. Mr. Schoonover said he then told the clerk it was to hold a 150 to 160 pound St. Bernard dog, and the clerk had replied that the chain "should do the job."

The president of the feed company testified that the store had been selling pet supplies since 1938 and that the chain was not one they would recommend for tying dogs to a fixed, stationary place and would have broken in another spot had it not broken where it did.

The trial judge ruled that the issue of negligence on the part of Clark Feed & Seed would not be allowed to go to the jury. The jury returned a verdict for the plaintiff Martin against the defendant Schoonover for $22,000. The defendants Schoonover appeal only the dismissal of their negligence theory as a part of their third-party complaint against Clark Feed & Seed, Inc.

The assignments of error present the following issues:

1. Should the claim of negligence against the third-party defendant have been submitted to the jury and the jury instructed on a theory of negligence in the defendant Clark Feed & Seed, Inc.?

2. Should the trial court have kept from the jury room deliberations a dog chain admitted into evidence for illustrative purposes after the jury had been instructed that they would receive all of the exhibits?

■ The third-party defendant has not filed a respondent's brief. We are assisted in our consideration of the issues raised only by the record and the brief of the appellant. When a respondent does not file a brief, the cause is deemed submitted "upon its merits as to him." CAROA 41(3). The absence of a respondent's brief leaves an appellate court with but one side of the picture presented and the issues out of focus. A respondent choosing to proceed on that course does so at his peril. *See Aquarian Foundation v. KTVW, Inc.*, 11 Wn. App. 476, 523 P.2d 969 (1974).

■ The first two assignments of error raise the question of whether negligence on the part of the retailer should have been submitted to the jury. The trial court ruled that there was no evidence as to what a reasonable man would have done and no evidence of what the defendant Clark Feed & Seed failed to do "except for the matter of asking for a clerk or the clerk asking for advice from the store owner." The trial court further noted that the defect in the weld of the chain link that broke was not one that was apparent and that a reasonable inspection would not have revealed the defect. On the basis that there was no evidence which would permit the jury to find that Clark Feed & Seed was negligent, the trial court declined to submit that issue to the jury. We find that ruling to have been correct.

The defendant Schoonover was asked on direct examination:

Q And when you went in, what did you do? A Well, I looked around and found the place where I guess . . . most of the dog supplies are located. It is a—chain collars and leashes and things of that nature. . . . There was a series of choke chains hanging off hooks or nails along the wall. I was, . . . studying the chains. I was trying to compute, . . . how big around it comes out to. How long for the size chain I might need. I was

looking at the chains and I believe that during this time a lady may have come up and said, . . . "May I help you?" And to which I probably replied, "I'm just looking right now." So after I selected what I felt, well, was the biggest chain there, the one that had the thickest links not necessarily the longest chain, but it was—I selected the one with the thickest links and I was walking back toward the cash register and as I recall, the woman said something about "Boy, that is a big chain; what is it for?" Or else, she said, . . . "What is that for?" or I said, "Well, it's for a St. Bernard," and I mentioned the weight about 150, 160 pounds because to me at this time a St. Bernard was kind of a status symbol. Very few people had them. I was kind of bragging about it. Q Did she respond? . . . A She responded to the sense, that should to the job or should do the job. . . . Q Did you examine the chain? A A cursory examination. When I took it off I looked at it. I guess a person picks a chain, pulls it a little bit, but I looked at the chain. Q Did you observe the clerk look at the chain? A She would have had to look at it to get the price tag. She looked at the chain.

On cross-examination, the defendant Schoonover testified that there was no advertising on the chain as to strength, that he picked the chain out for himself, that the clerk did not pick it out for him, and that by the time he told the clerk what the choke chain was for, he had already selected the chain that he purchased.

Exception was taken to the trial court's failure to give the defendant Schoonover's proposed instruction which, though unclear in its wording, attempted to tell the jury that a retailer has a duty to exercise reasonable care in offering for sale an article which, unless carefully constructed, would present an unreasonable risk of harm to those who use it for the purpose for which it is sold.

The trial court submitted the case to the jury on instructions which informed them that there was a claim over by the defendant Schoonover against the defendant Clark Feed & Seed and that they could find (a) for the plaintiff against the defendant Schoonover or (b) against the plain-

tiff or (c) for the plaintiff on plaintiff's claim against Schoonover and also for defendant Schoonover on the cross claim against the defendant Clark Feed & Seed. The trial court also instructed the jury as follows:

No. 7

You are instructed that one who sells any product in a defective condition unreasonably dangerous to the purchaser is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

No. 8

A law of the State of Washington provides:

"A warranty that the goods shall be merchantible [sic] is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Goods to be merchantible [sic] must be at least such as are fit for ordinary purposes for which such goods are used."

The defendants Schoonover rely on *Peters v. Lyons*, 168 N.W.2d 759 (Iowa 1969). The *Peters* case also involved a dog bite following the breaking of a weld in a choke chain purchased from a retailer and then used to stationarily secure an offending dog. However in *Peters v. Lyons*, a cause arising prior to the effective date of the Uniform Commercial Code in Iowa, the evidence showed that the purchaser had told the clerk that he needed a chain to restrain a large dog, and the clerk had then picked out the chain for him. The case was tried to the court which found that the retailer had impliedly warranted the product's fitness under the then existing Iowa law. The theory of negligence on the part of the retailer was not before the court in that case. Here, the trial court did instruct the jury on the strict liability and the implied warranty of merchantability theories of the defendant Schoonover, but the jury denied recovery over to Schoonover on either theory, which it could do if it found the chain was not unreason-

ably dangerous and was fit for the ordinary purpose for which it was sold. The question of retailer negligence is not discussed in *Peters v. Lyons*, and the case does not compel a submission of a theory of retailer negligence to the jury when evidence of such negligence is lacking.

■ We recognize that the theory of strict liability is not exclusive, and a plaintiff may also sue on a negligence theory if he chooses. *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969); *Palmer v. Massey-Ferguson, Inc.*, 3 Wn. App. 508, 476 P.2d 713 (1970).

■ However, if one of the foundations of a products liability case is to be negligence, there must be substantial proof presented of each of the elements of actionable negligence. The elements to be proven in a products liability case based upon the alleged negligence of a seller of a product are (a) the offer of sale of the product by a retailer, (b) a duty of care in the retailer, (c) a failure by act or omission to perform the duty, (d) an injury occurring from use of the product and (e) a proximate cause of the injury was a failure to perform the duty.

■ The general rule is that a retailer does not assume the negligence of those further down the distributive chain. The more the retailer is only a conduit for the product, the less likely he can be held in negligence. *Brock v. Simpson*, 103 Ga. App. 800, 120 S.E.2d 885 (1961). Conversely, the more the retailer takes an active part in preparing the product for final use and takes the role of a manufacturer or assembler, the more likely he can be found liable in negligence. *See Cody v. Toller Drug Co.*, 232 Iowa 475, 5 N.W.2d 824 (1942); *Parisi v. Carl W. Bush Co.*, 4 N.J. Super. 472, 67 A.2d 875 (1949); *Betehia v. Cape Cod Corp.*, 10 Wis. 2d 323, 103 N.W.2d 64 (1960). If a retailer adopts a product as his own, he is subject to the same liability for negligence as is the manufacturer. 2 Restatement (Second) of Torts § 400 (1965). The retailer can be found negligent in cases where he has failed to make an inspection of the product prior to sale when it was reasonable for him to do so in light of the nature of the product, the reputability of the

supplier and the scope of the risk. *McKinney v. Frodsham,* 57 Wn.2d 126, 356 P.2d 100 (1960); *Ringstad v. I. Magnin & Co.,* 39 Wn.2d 923, 239 P.2d 848 (1952). The evidence does not indicate that the retailer in this case had any of these possible responsibilities.

 Conversely, a seller does not have a duty to inspect or test a product for possible defects unless he has reason to know the product is likely to be dangerously defective. *Sears, Roebuck & Co. v. Marhenke,* 121 F.2d 598 (9th Cir. 1941); *Dipangrazio v. Salamonsen,* 64 Wn.2d 720, 393 P.2d 936 (1964); *Ringstad v. I. Magnin & Co., supra;* 2 Restatement (Second) of Torts § 402 (1965); Annot., 6 A.L.R.3d 12 (1966). The duty to inspect and test a chain for a latent defect is a duty normally to be borne by its manufacturer. *Employers' Liability Assur. Corp. v. Columbus McKinnon Chain Co.,* 13 F.2d 128 (W.D.N.Y. 1926). Likewise, the retailer is not ordinarily responsible for failure to discover a latent defect (*Kasey v. Suburban Gas Heat,* 60 Wn.2d 468, 374 P.2d 549 (1962)) and is not negligent unless he knows of a risk and fails to warn others who would not realize the product's dangerous propensities. *Dalton v. Pioneer Sand & Gravel Co.,* 37 Wn.2d 946, 227 P.2d 173 (1951); 2 Restatement (Second) of Torts §§ 388, 399 (1965).

*Burnett v. Hunt,* 5 Wn. App. 385, 391-92, 486 P.2d 1129 (1971) commenting on the duty of care of the retailer stated:

> where a retail dealer sells an article which is in a condition dangerous to human life, he is liable for injuries proximately resulting from a use of the article for the purpose intended if the dealer
>
> (a) knows, or in the exercise of reasonable care should know that the article is dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that the purchaser or others using the article for the intended purpose will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform the purchaser of such dangerous condition.
>
> A dealer in new or used articles is not liable for injuries resulting from latent defects which are in fact un-

known to him. He is not required to dismantle the article or make a factory type of inspection. He is required to exercise reasonable care to ascertain patent defects which are dangerous to human life and which he could discover by the exercise of reasonable care.

*See also Fleming v. Stoddard Wendle Motor Co.*, 70 Wn.2d 465, 423 P.2d 926 (1967); 2 Restatement (Second) of Torts § 388 (1965). The various theories of liability are not to be confused with each other. Strict liability arises if requisite circumstances have occurred and an implied warranty of merchantability arises under certain conditions while an implied warranty of fitness for use comes about under others. The narrow issue raised on appeal is whether the evidence was sufficient to permit the question of negligence on the part of the retailer to go to the jury. The trial court was correct in refusing to submit the issue.

During the trial, the previous owner of the offending dog, a kennel owner, testified that it was his experience that dogs have a tendency to "break a lot of choke chains. Even the best you can get, they break them." At this point in the testimony, defendant Schoonover's exhibit No. 8, a regular choke chain, was marked for identification and offered into evidence for illustrative purposes. The court admitted the exhibit "for illustrative purposes only, and the admission specifically reserves the question as to whether the exhibit will be permitted to go to the jury room." Following the argument of counsel, as the jury was retiring to deliberate their verdict, the court raised the question of whether the choke chain should be permitted to go to the jury room. The court, remarking that the chain was not the one involved and was of different construction, precluded the exhibit from going to the jury room stating: "I think the danger of the jurors testing this chain in the privacy of the jury room in a more violent manner than was permissible in Open Court would outweigh the potential illustrative effect it would have at this point."

The court, in its instructions, had told the jury that the evidence they were to consider included the exhibits

offered and received. *See* WPI 1.01, 6 Wash. Prac. 2 (1967). CR 51(h) provides that all of the exhibits received in evidence are to go to the jury for their use in their deliberations. This rule, however, is subject to a limited discretion in the trial judge when an exhibit is admitted only for illustrative purposes. The trial judge is not precluded from protecting the orderly consideration of exhibits when the jury has received the benefit of the exhibit by observing it in open court and the danger of misuse during deliberation is apparent.

In *Higgins v. Los Angeles Gas & Elec. Co.*, 159 Cal. 651, 115 P. 313 (1911), there is an indication that the trial court has a tempered discretion in controlling the use that juries may make of exhibits. It was there stated on pages 656-59:

> The court may permit the jury to take with them and use in their deliberations any exhibit where the circumstances call for it, observing the proper precaution of instructing the jury in the nature of the use which they shall make of the exhibit. It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of such exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.
>
> . . .
>
> In most of the cases, because of the very nature of the exhibit and of all the possible uses to which it may be put in the jury-room, there is no occasion for the court to admonish the jury or to caution and limit it as to the nature of the use or experiment which shall be made. But where from its nature, it may be susceptible to im-

proper use, as in the case of the can of opium, it is the duty of the court, by instruction to the jury, to limit and restrict that use.

We recognize that the *Higgins* case contemplates only the jury's experimentation with an exhibit during deliberation and did not grant to a trial judge the discretion to completely withhold an exhibit from the jury room. The decision does recognize, however, that a jury can misuse an exhibit and that jury use can be limited by the trial judge. It was this concern of wrongful experimentation that brought about the retention of the choke chain in the custody of the court clerk.

In line with this reasoning, *State v. Burke*, 124 Wash. 632, 215 P. 31 (1923), held a jury should not conduct an experiment on their own by which they discover additional evidence not introduced in the case or known by the parties or the court but permitted jury experimentation when the experiment involves only a more critical examination of an exhibit than had been made of it in court. *See also United States v. Beach*, 296 F.2d 153, 95 A.L.R.2d 342 (4th Cir. 1961); Annots., 37 A.L.R.3d 238 (1971); 10 A.L.R.2d 918 (1950); 2 L. Orland, Wash. Prac. § 230(2) (3d ed. 1972).

The trial judge must have a modicum of control over the proceedings in his courtroom in order to preserve order and provide for the safety of all participants. If the exhibit offered and admitted for illustrative purposes only had been corrosive acid, blasting caps or a rattlesnake, the trial judge would not only have discretion to keep such exhibits away from jury experimentation but common sense would require the judge to do so.

In the *State Trial Judge's Book* 167 (2d ed. 1969), we find:

> As a general rule the trial court may, in its discretion, permit the jury to have in the juryroom writings and other tangible objects which have been admitted in evidence.

*See also* 75 Am. Jur. 2d *Trial* §§ 1031, 1032 (1974).

The discretion to control the use of exhibits admitted for

illustrative purposes only should be exercised with caution lest the trial judge keep from the jury exhibits which will assist their deliberation. The risk of misuse and of such misuse misleading the jury was very possible under the circumstances. The trial judge did not abuse his discretion in handling the situation as he did, and we find no prejudice to the defendant resulted.

The judgment is affirmed.

SWANSON and ANDERSEN, JJ., concur.