[No. 7816–7–III.   Division Three.   October 20, 1987.]

KENDEL S. THOMPSON, ET AL, *Appellants,* v. ROCKFORD MACHINE TOOL CO., ET AL, *Defendants,* THE BOEING COMPANY, *Respondent.*

*R. Bruce Owens,* for appellants.

*Robert P. Hailey* and *Randall & Danskin,* for respondent.

McINTURFF, C.J.—Kendel S. Thompson and his former wife brought this action for damages sounding in strict liability, negligence and breach of warranty against Rockford Machine Tool Co., the Boeing Co. and Hallidie Machine, Inc. The Thompsons appeal the Superior Court's summary dismissal only as to Boeing.[1] We reverse the dismissal of the Thompsons' strict liability claim, but affirm the dismissal of the remaining two claims.

The complaint alleges Mr. Thompson was injured operating a hydraulic planer in March 1980[2] while employed by Allied Safe & Vault Co. Rockford manufactured the planer and sold it to Boeing sometime prior to the end of 1957. Boeing used the planer in its Renton tooling/jig shop until early 1970. Boeing employees Jose Rosas and Clarence Colsrud attested that no accidents occurred in connection with the planer during that time.

In 1968, Boeing's rebuild shop reconditioned the machine. In their affidavits, Boeing employees Edward

---

[1]The Superior Court also has entered orders of dismissal in favor of Hallidie and Rockford. Thus, this appeal is from a final judgment. RAP 2.2(a)(1).

[2]The product liability act, RCW 7.72, is inapplicable to this case as the injury occurred prior to the effective date of that act. *See* RCW 4.22.920.

Rommel and Ronald Henkel stated that Boeing's purpose in rebuilding equipment was to continue using it in its business, not to resell it, and that the planer was in fact returned to the tooling/jig shop. Both employees gave detailed descriptions of the reconditioning procedure. They stated Boeing does not make any changes in the design of machines it rebuilds but, rather, reassembles and realigns the machines in accordance with factory specifications. In response, the Thompsons relied on a portion of Mr. Rommel's deposition in which he says that machines were rebuilt according to machine tool standards and OSHA standards in effect at that time.[3]

Due to a downturn in business in 1970, Boeing sold much of its equipment to alleviate cash flow problems. On May 13, 1971, it sold the planer to Allied Safe & Vault Co. through Hallidie. At the time of the sale the planer bore a tag indicating it had been rebuilt by Boeing, Inc. Mr. Thompson cited the Superior Court to the portions of Mr. Rommel's and Mr. Keaster's depositions which state Boeing has a special ongoing department that disposes of surplus equipment.[4]

---

[3]Although the depositions themselves were not published, Boeing does not object to our considering the portions of the depositions which Mr. Thompson cited to the Superior Court.

[4]Mr. Rommel testified:
"Q . . . What is Reserve Property?
"A (By Mr. Rommel) That's where the surplus equipment is handled.
"Q Is that a department where equipment, then, that you're phasing out would be transferred to so it could be sold?
"A Yes, sir.
"Q Is that a department within Boeing?
"A Yes, sir. It belongs to another division; belongs to Seattle Services Division, now SSD.
". . .
"Q But the purpose of the Reserve Property Department is to sell used equipment, is that it?
"A They sell all kinds of things down there. It's open to the public at Kent, I guess about five days a week, and there's all kinds of things in there. . . . Most of the major machine tools would be handled by a vendor."
Mr. Keaster testified:

According to Mr. Thompson the accident occurred when he was loading some vault doors onto the planer. Because the doors extended past the edge of the planer's table, a co-worker used a forklift to hold up the overhang. One of the forks hit the control lever on the left side of the planer, opposite the side on which the operator usually stands, and the machine started, injuring Mr. Thompson who was then working on top of the table. The lever on the left side of the machine did not have a safety detent (notch) but relied on the safety detent which exited on the operator's side of the machine.

In opposition to Boeing's motion for summary judgment, the Thompsons submitted the affidavit of Vaughn P. Adams, an industrial engineer, who inspected the machine, reviewed safety engineering standards, and attested:

7. The [machine's] transfer table actuation lever was placed within a region of foreseeable, inadvertent contact. Inadvertent contact will cause the transfer table to advance into the machine resulting in serious personnel injury.

8. The activation control lever was not guarded or otherwise designed to prevent against inadvertent activation.

. . .

11. There was no "status" indicator light on the subject

---

"A (By Edward [Keaster], Jr.) I was there, you know, in the department was— that period of time and there was an awful lot of equipment that was sold just because it was surplus, we didn't need it, just to liquidate it and get, you know, cash, you know, cash flow into the company.

". . .

"Q . . . What is the specific title of the department that is in the business of selling capital equipment, surplus capital equipment?

". . .

"A Today's its called the Surplus Property Disposition Department, O.K.? Back when the machine was sold it was known as the Reserve Property Management.

". . .

"Q . . . And the ongoing purpose of the Reserve Property Management Department back in 1972 was what?

"A To dispose of surplus property and equipment.

"Q And that was done on a day-to-day basis?

"A That's correct."

machine to warn or alert an operator that the equipment was in an operating mode ("on").

12. There was no guard enclosing the planer bed to protect operators/users of the hazards associated with the reciprocating table.

. . .

15. Without a means to prevent against inadvertent actuation of the reciprocating table and a status indicator display the machine is unreasonably hazardous for operation.[5]

First, we consider the Thompsons' strict liability claim. Restatement (Second) of Torts § 402A (1965) provides in part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user . . . if

(a) *the seller is engaged in the business of selling such a product,* and

(b) it is expected to and does reach the user . . . without substantial change in the condition in which it is sold.

(Italics ours.) Washington adopted section 402A in *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 149, 542 P.2d 774 (1975) and *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969).

The initial question we address is whether strict liability under section 402A for design and manufacturing defects should be imposed on a dealer of used goods.[6] This

---

[5]In its brief Boeing correctly points out that Dr. Adams' legal conclusions as to Boeing's status as a rebuilder and its consequent duties must be disregarded. *Orion Corp. v. State,* 103 Wn.2d 441, 461–62, 693 P.2d 1369 (1985). However, we disagree with Boeing's characterization of the portions of the affidavit quoted above as conclusory and unsupported. Dr. Adams' statements are supported by his familiarity with safety standards and his inspection of the machine in question. His conclusion that the machine was unreasonably hazardous is an expert opinion admissible under ER 704. *Lamon v. McDonnell Douglas Corp.,* 91 Wn.2d 345, 352, 588 P.2d 1346 (1979).

[6]Our analysis of this issue applies only to causes of action arising before the effective date of the products liability act, RCW 7.72. Under RCW 7.72.010:

"(1) . . . "product seller" does not include:

question has produced a split of authority. *See* Annot., *Strict Liability and Tort: Liability of Seller of Used Product,* 53 A.L.R.3d 337 (1973); W. Kimble & R. Lesher, *Products Liability* § 64, at 112 (1979); 1 *American Law of Products Liability 3d* § 5:8, at 20 (1987).

In holding such dealers strictly liable, the New Jersey court reasoned:

An economic analysis of enterprise liability, which includes direct as well as indirect costs, would charge those in the business of selling a defective product with responsibility for all harms, physical and economic, which result from its use. To a considerable extent—with respect to *new* goods—the manufacturer bases the cost of his product on his expenses, which include damages caused by the product and insurance to cover those damages. This cost is spread among all the customers for that product; it reflects the justifiable expectations of customers regarding safety, quality and durability of new goods. *Sellers of used goods may similarly distribute their costs of doing business which, in turn, will reflect what is considered by the public to be justifiable expectations regarding safety, quality and durability of used goods.*

. . . [R]ealistic expectations of quality and durability will be lower for used goods, commensurate with their age, appearance and price.

However, safety of the general public demands that when a used motor vehicle, for example, is sold for use *as a serviceable motor vehicle* (and not as junk parts), absent special circumstances, the seller be responsible for safety defects whether known or unknown at time of sale, present while the machine was under his control. Otherwise, the buyer and the general public are bearing the enterprise liability stemming from introduction of the dangerously defective used vehicle onto the public highways. . . .

* * * It is conceded that a buyer of a used car, for

"...

"(c) A commercial seller of used products who resells a product after use by a consumer or other product user: *Provided,* That when it is resold, the used product is in essentially the same condition as when it was acquired for resale; . . ."

example, cannot expect it to last as long as a new one. But it can be argued that he is entitled to expect that there is no latent defect in the brakes or other parts of the car. [2 L. Frumer & M. Friedman, *Products Liability* § 19.03[5], at 5–129 (1960).]

(Citations omitted. Italics ours.) *Turner v. International Harvester Co.,* 133 N.J. Super. 277, 336 A.2d 62, 69 (1975).[7]

Washington looks at similar policy considerations in applying section 402A:

The paramount policy to be promoted by the rules of strict liability is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them. The theoretical foundation of strict liability is that manufacturers who place their products in the stream of commerce impliedly represent their goods as safe for intended use.

*Hall v. Armstrong Cork, Inc.,* 103 Wn.2d 258, 265, 692 P.2d 787 (1984) (citing, *inter alia, Seattle–First Nat'l Bank v. Tabert, supra). See also Zamora v. Mobil Oil Corp.,* 104 Wn.2d 199, 206–07, 704 P.2d 584 (1985). These objectives are furthered by holding a dealer of used products strictly liable. Nothing in section 402A requires the seller to be in the "initial" chain of distribution, and there is no justification for finding that dealers of used goods as a class cannot shift losses, distribute costs, or insure against losses. Thus, we hold that section 402A applies to a dealer of used products.[8]

In so holding, we have considered and rejected the rationale of the Oregon and California courts which have

---

[7]Texas and Arizona also have held dealers of used products subject to strict liability. *See Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236 (Ct. App. 1983); *Hovenden v. Tenbush,* 529 S.W.2d 302 (Tex. Civ. App. 1975).

[8]We could find no prior Washington case directly addressing this issue. The closest case is *Bombardi v. Pochel's Appliance & TV Co.,* 9 Wn. App. 797, 515 P.2d 540, *modified,* 10 Wn. App. 243, 518 P.2d 202 (1973), in which the purchaser of a used television successfully invoked section 402A in a suit against the *manufacturer* of the television.

reached the opposite result. In *Tillman v. Vance Equip. Co.*, 286 Or. 747, 596 P.2d 1299 (1979),[9] the court noted that in Oregon imposition of strict liability is justified, in part, on the theory that a seller makes an implied representation of safety to the consumer. The *Tillman* court reasoned that the sale of a used product does not generate the kind of safety expectations created when a product is first put on the market.

We do not find this distinction persuasive. Consumers of used products have reasonable safety expectations also. Liability is imposed under section 402A if the product is not reasonably safe, *i.e.*, if it is unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. *Tabert*, at 154. Under *Tabert*:

> In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

*Tabert*, at 154. This standard allows inquiry into matters such as age and condition of a used product and provides sufficient protection to a dealer of used products.

The *Tillman* court took the position that the risk reduction aspect of strict liability would not be furthered by imposing strict liability on a dealer of used products. Since such a dealer is outside the original chain of distribution, the court reasoned that the dealer and manufacturer would have no ready avenue of communication by which to

---

[9]Florida and Wisconsin have adopted *Tillman's* analysis on this issue: *Keith v. Russell T. Bundy & Assocs.*, 495 So. 2d 1223, 1228 (Fla. Dist. Ct. App. 1986); *Burrows v. Follett & Leach, Inc.*, 115 Wis. 2d 272, 340 N.W.2d 485, 490–91 (1983). Iowa has held that the seller of a used good is not strictly liable where the defect is, *inter alia*, not a manufacturing or design defect. *Grimes v. Axtell Ford Lincoln–Mercury*, 403 N.W.2d 781, 785 (Iowa 1987). The court expressly left open the possibility of applying strict liability to sellers of used goods under other circumstances. *Grimes*, at 783.

exchange information with a view to eliminating defects. Again, we are not persuaded by this analysis. The seller of used products is part of the chain of distribution. He offers the products for sale and profits therefrom. As the Arizona court in *Jordan v. Sunnyslope Appliance Propane & Plumbing Supplies Co.,* 135 Ariz. 309, 660 P.2d 1236 (Ct. App. 1983) observed, "imposing strict liability on the commercial dealer of used products should result in increased maintenance and inspection of such products before they are offered for sale." *Jordan,* at 313 (citing *Escola v. Coca Cola Bottling Co.,* 24 Cal. 2d 453, 462, 150 P.2d 436, 440–41 (1944)).

In *LaRosa v. Superior Court,* 122 Cal. App. 3d 741, 176 Cal. Rptr. 224, 231–32 (1981), the court viewed section 402A as applying to *any* sale of a defective product. However, the court held that under California law a used machinery dealer was not strictly liable, in part because California courts have not deemed themselves bound by section 402A. It cited *Cronin v. J.B.E. Olson Corp.,* 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972), in which the court rejected the "unreasonably dangerous" element of section 402A and instead held a plaintiff need only show the product contained a defect which proximately caused his injuries. *Tabert* has interpreted "unreasonably dangerous", as used in section 402A, as meaning a product which is not reasonably safe. As noted above, this standard provides a certain amount of protection to the dealer of used products since it allows the trier of fact to consider the intrinsic nature of the product. *Tabert,* at 154. California has no similar standard, and, therefore, has a reason which we do not have to limit the imposition of strict liability in this context.

Our threshold determination that a dealer of used products may be strictly liable under section 402A leads us to the next question: Does an issue of material fact exist as to whether Boeing was a dealer of used products? Section 402A applies to sellers "engaged in the business of selling such a product". Restatement (Second) of Torts § 402A-

(1)(a) (1965). Comment *f* to section 402A provides in part:

> The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. . . . The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale . . .

Comment *f* does not provide a test of easy application for distinguishing the occasional seller from one engaged in the business. Thus, we begin with the rationale underlying strict liability for product defects. Comment *c* to section 402A provides the following justifications for strict liability: (1) those engaged in the business of selling products have assumed a special responsibility to the public; (2) the public is often forced to rely on commercial sellers and has the right to expect that they will stand behind their products; and (3) the commercial seller is better able to spread the loss caused by defective products. As noted above, Washington products liability cases embrace this statement of rationale. *Hall v. Armstrong Cork, Inc., supra.*

Clearly, the rationale for imposition of strict liability is served only if the defendant is in the business of releasing products into the stream of commerce. At least on the face of comment *f,* the occasional seller category applies where sales are so infrequent or sales efforts are so minimal that the rationale underlying strict liability is not furthered by application of section 402A to those transactions.

Our review of the case law reveals that most of the decisions that have found the seller of equipment used in that seller's business to be an "occasional seller" involved a single sale or transaction in which the rationale for imposition of strict liability was lacking. *Daniels v. McKay Mach. Co.,*

607 F.2d 771, 775–76 (7th Cir. 1979); *Bruce v. Martin–Marietta Corp.,* 544 F.2d 442 (10th Cir. 1976); *Bailey v. ITT Grinnell Corp.,* 536 F. Supp. 84, 87–89 (N.D. Ohio 1982); *Balido v. Improved Mach., Inc.,* 29 Cal. App. 3d 633, 105 Cal. Rptr. 890, 895 (1972); *Siemen v. Alden,* 34 Ill. App. 3d 961, 341 N.E.2d 713, 715 (1975); *Allen v. Nicole, Inc.,* 172 N.J. Super. 442, 412 A.2d 824, 826 (1980); *Sukljian v. Charles Ross & Son Co.,* 69 N.Y.2d 89, 503 N.E.2d 1358, 1361–64, 511 N.Y.S.2d 821 (1986). *See generally* Annot., *When Is Person "Engaged in the Business" for Purposes of Doctrine of Strict Tort Liability?,* 99 A.L.R.3d 671 (1980).

The preceding cases are distinguishable from the instant situation. Our record contains unrebutted evidence that Boeing maintained a separate, ongoing department devoted to the sale of its used equipment.[10] In a similar situation, the Fifth Circuit, applying Texas law, reversed a summary judgment dismissing Georgia–Pacific Corp. from a section 402A action brought by a plaintiff injured by a sawmill trimmer formerly owned by Georgia–Pacific and sold by it to a used equipment dealer. *Galindo v. Precision Am. Corp.,* 754 F.2d 1212, *reh'g denied,* 762 F.2d 1004 (5th Cir. 1985). There, the evidence showed Georgia–Pacific operated more than 240 plants and mills and that sale to equipment dealers and other parties was one of the ways it regularly disposed of equipment it no longer needed. *Galindo,* at 1215.

The *Galindo* court held:

> [T]here may exist circumstances in which a seller of equipment used in the seller's primary business, by virtue of the extent of sales efforts, has created justified reliance or otherwise implicated the rationales underlying the imposition of section 402A liability.

*Galindo,* at 1220. The court's opinion continues:

---

[10]In its brief Boeing argues that the deposition testimony of Messrs. Rommel and Keaster only related to a short period of time in the early 1970's when Boeing had to sell equipment to generate cash flow. However, from the testimony, it is clear that Boeing maintained and continues to maintain a separate department devoted to resale of its equipment.

It would be premature on the record before us to attempt a definitive delineation of those circumstances. The relevant inquiry, however, is whether the seller's conduct would justify a conclusion that (1) he has undertaken a special responsibility for product safety; (2) the public has a right to expect that he will stand behind the product; and (3) as between the consumer and the seller, it is equitable to impose upon the seller the loss caused by the product and the burden of spreading that loss as a cost of doing business.

. . .

. . . The affidavit leaves many material fact questions about Georgia–Pacific's sales of used sawmill equipment unanswered. For example, Georgia–Pacific made no showing with respect to (1) the number of used equipment sales made by Georgia–Pacific; (2) the amount of revenue generated by those sales; (3) the number of employees or the extent of other corporate resources devoted to making the sales; or (4) the use of advertising or other marketing techniques to publicize the availability of used equipment for sale. . . . Since the affidavit leaves open the possibility that these questions will be answered in a manner favorable to Galindo, summary judgment for Georgia–Pacific was improper.

*Galindo,* at 1221–22.

Here, Boeing has not met its burden, as the moving party, of establishing the absence of any genuine issue of material fact concerning whether it was engaged in the business of selling used equipment. *Balise v. Underwood,* 62 Wn.2d 195, 199, 381 P.2d 966 (1963). As in *Galindo,* the deposition testimony that Boeing maintained a separate, ongoing department devoted to selling its used equipment leaves many material fact questions unanswered. Thus, entry of summary judgment on this issue was error. On remand, we refer the parties and the court to the portions of the *Galindo* opinion quoted above.

Second, does an issue of material fact exist as to whether Boeing owed a duty of care to Mr. Thompson?

Negligence is the failure to exercise ordinary care under the circumstances. It involves, *inter alia,* a duty to the plaintiff. Generally, "the duty to inspect or test for

defects lies with the manufacturer rather than the retailer" of a product. *Padron v. Goodyear Tire & Rubber Co.,* 34 Wn. App. 473, 477, 662 P.2d 67, *review denied,* 100 Wn.2d 1003 (1983). *See also* Restatement (Second) of Torts § 402 (1965); W. Kimble & R. Lesher, *Products Liability* § 175 (1979). "A duty to warn arises when the supplier 'knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied'." *Zamora v. Mobil Oil Corp.,* 104 Wn.2d at 204 (quoting Restatement (Second) of Torts § 388(a) (1965)); *Martin v. Schoonover,* 13 Wn. App. 48, 55, 533 P.2d 438 (1975). "[T]he more the [seller] takes an active part in preparing the product for final use and takes the role of a manufacturer or assembler, the more likely he can be found liable in negligence." *Zamora,* at 204 (quoting *Martin,* at 54). *See also* Annot., *Seller's Duty To Test or Inspect as Affecting His Liability for Product–Caused Injury,* 6 A.L.R.3d 12, § 8, at 37 (1966).

Here, Boeing had no actual knowledge of the alleged defect; its employees had operated the planer for years without incident. But, did it assume the role of a manufacturer and, thus, a duty to inspect or test for that defect when it undertook to rebuild the planer? The controlling fact is that Boeing's purpose in rebuilding the planer was to continue using the machine in its business. In these circumstances, Boeing did not owe Mr. Thompson a duty to inspect or test for defects, and summary judgment was properly granted dismissing the Thompsons' negligence claim.

■ Third, does an issue of material fact exist as to whether Boeing breached express and implied warranties to the Thompsons? *Baughn v. Honda Motor Co.,* 107 Wn.2d 127, 727 P.2d 655 (1986) is dispositive. There, the plaintiffs brought negligence, strict liability, and breach of warranty actions against the manufacturer of a mini–trail bike. Since there was no privity between the plaintiffs and the manufacturer, the court held that plaintiffs could not maintain their implied warranty claim. *Baughn,* at 151. Similarly,

here, no privity of contract exists between the Thompsons and Boeing. Thus, the implied warranty claim was properly dismissed.

As to express warranty claims, the *Baughn* court noted the privity requirement is relaxed, citing J. White & R. Summers, *Uniform Commercial Code* § 11–7, at 410 (2d ed. 1980). *Baughn,* at 151. Nevertheless, the court held the manufacturer's advertising, on which the plaintiffs' claims were based was opinion rather than affirmations of fact about the goods. *Baughn,* at 152. Here Boeing never made any affirmations of fact regarding the planer. The fact that the planer was tagged "rebuilt by Boeing" at the time of sale does not amount to an express warranty. Thus, the Superior Court properly dismissed the claim.

The judgment of the Superior Court which dismissed the Thompsons' cause of action against Boeing based upon strict liability is reversed; the remainder of the judgment is affirmed.

GREEN and GROSSE, JJ., concur.

Review denied by Supreme Court February 1, 1988.